## GANGI v. D. A. SCHULTE, Inc.

District Court, S. D. New York.

Dec. 28, 1943.

Isadore Entes, of New York City (Abraham E. Jacobs, of New York City, of counsel), for plaintiffs.

Ernst, Gale, Bernays, Falk and Eisner, of New York City (Edwin A. Falk and Abraham Friedman, both of New York City, of counsel), for defendant.

RIFKIND, District Judge.

Plaintiffs were employees of the defendant, engaged in the operation and maintenance of a twenty-three story, loft building located at 571/581 Eighth Avenue, in the Borough of Manhattan, in the City of New York. They have brought this action to recover from their employer liquidated damages for violation by the employer of the provisions of Section 7 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 207.

The period during which the violation is alleged to have occurred is October 24, 1938 to February 5, 1942. It has been stipulated that on or about September 24, 1942, the employees received an amount equal to the unpaid over-time compensation to which they would have been entitled if they were subject to the provisions of the Act except for the amount of liquidated damages as provided in Section 16, 29 U.S.C.A. § 216.

Defendant denies that plaintiffs were engaged in commerce or in the production of goods for commerce. Affirmatively, defendant pleads the defenses of accord and satisfaction and release in addition to a number of other affirmative defenses, which need not now be considered since they were stricken out on motion.

If the defenses of accord and satisfaction and release are sufficient in law and are established by the proof, the complaint must be dismissed and the other issue in the case will not require resolution.

There is no substantial dispute as to the facts. Shortly after the decision of the United States Supreme Court in A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, decided June 1, 1942, the defendant's district manager was approached by one Johnson, Union shop steward, with a request for consideration of the employees' claim for overtime compensation. The defendant's district manager took the position that the employees of the building were not covered by the provisions of the Act on the ground that the tenants of the building were largely contractors who performed labor for New York manufacturers.

---

About a week later, the defendant's district manager again spoke to Johnson and told him that the defendant's officers were satisfied that no additional compensation was payable to the employees and that they would not pay any. Johnson responded that he would communicate that decision to his fellow employees, all of whom were members of the Union with which the defendant had a closed shop agreement.

Johnson was succeeded in the office of shop steward by plaintiff, Gangi, and in August, the latter informed the district manager that the building employees demanded over-time compensation plus liquidated damages and that, unless the defendant paid an amount, so calculated, to each of the employees, they would institute suit. The district manager responded that he would report the°decision of the employees to his superiors. Several weeks later, the district manager reported to Gangi that the defendant denied liability under the Act but, in order to avoid litigation, it was prepared to pay unpaid over-time compensation without liquidated damages. Gangi replied that he would submit the proposal to his fellow employees and the next day reported that the proposal was accepted.

On September 24, 1942, the district manager sent for Gangi and told him that he had checks covering unpaid over-time compensation and a form of release which he asked him to sign. Gangi replied that before he would sign the release he must seek advice. He went away and communicated by telephone with the Wage & Hour Administration and with an official of the Union. He returned, signed the release, delivered it, and accepted the check. The other employees did likewise. Gangi testified that he was fully authorized to conduct these negotiations and to consummate the agreement on behalf of his fellow employees, who are coplaintiffs in this action.

The release, which was signed by each of the plaintiffs, read as follows: "The undersigned, an employee of D. A. Schulte, Inc., in premises 575 Eighth Avenue, New York City, does hereby acknowledge receipt of the sum of $........ as payment in full of all sums, if any, which may be due to the undersigned by said D. A. Schulte, Inc., by reason of the Federal Wage & Hour Act, and the undersigned does hereby release said D. A. Schulte, Inc., from any other further obligations in connection therewith."

Gangi, who testified on behalf of the plaintiffs, gave every evidence of being able, intelligent, and well-informed. Nothing has been suggested to impugn the integrity of the release except the public policy underlying the Act.

Neither before the commencement of the action, nor since, has any one of the plaintiffs paid back or tendered to the defendant the amount received by him upon the execution and delivery of the release.

In order to understand the nature of the controversy or dispute btween the plaintiffs and the defendant during the summer of 1942, some additional facts should be mentioned which have a bearing upon the issue of coverage. It appears that the building is tenanted by many persons who serve the dress manufacturing industry. The latter industry, in the City of New York, seems to be organized along the following lines. The dress manufacturer purchases the fabrics and other materials which go into the production of a dress, and usually has the material cut in accordance with his own designs. He maintains a showroom and sales force for the exhibition and sale of his wares. He does not manufacture the dress. The actual work of fabrication is performed by a number of contractors of whom there are several varieties. One variety consists of so-called dress contractors. They employ a force engaged in sewing garments. The second variety consists of contractors who pleat, trim and stitch. Their work is performed upon the garments either before or after they are handled by the dress contractor, as the designs permit. A third variety consists of those who fabricate belts and similar accessories. All the contractors get the fabrics from the manufacturer and return them, after they have received the benefit of their services, to the manufacturer. These manufacturers are located within the City of New York. The defendant's building was occupied by many of these several varieties of contractors.

If we try to reconstruct the dispute between the plaintiffs and defendant during the summer of 1942, it is evident that one of the questions, which confronted both the plaintiffs and defendant, was: is a building-maintenance employee, employed in a building, which houses tenants, some of whom are engaged in performing services upon goods belonging to New York manufacturers, engaged in the production

of goods for commerce, within the meaning of the Fair Labor Standards Act?

A subsidiary question that necessarily confronted them was: assuming that the former question depends upon whether the manufacturers sell, in inter-state commerce, the dresses worked upon by the contractors, how difficult would it be to ascertain the facts with respect to the distribution of the specific garments?

Taking these questions into consideration, I have come to the conclusion that there was a genuine dispute between the parties pertaining to a claim for compensation for a period long past; that the parties, negotiating at arm's length, and without mistake, fraud or misrepresentation on either part and without overreaching, reached an accord and an agreement for the settlement of their dispute; that the amount agreed upon was an amount equal to the over-time compensation that would be payable if the Act applied without liquidated damages, and that such amount was paid by the defendant and received by the plaintiffs in satisfaction of the claim; that to evidence that transaction, the plaintiffs executed and delivered to the defendant releases under seal and that such accord and satisfaction and release should be given effect unless the statute forbids.

That the statute does forbid giving effect to such a release was stated in Fleming v. Warshawsky & Co., 7 Cir., 1941, 123 F.2d 622; and the contrary view, at least with respect to liquidated damages, was taken in Guess v. Montague, 4 Cir., 140 F.2d 500. See also Seneca Coal & Coke Co. v. Lofton, 10 Cir., 1943, 136 F.2d 359, and Rigopoulos v. Kervan, 2 Cir., 140 F.2d 506.

If the logical implications of the Warshawsky case are followed out, then the releases here must be rejected as insufficient. If the Guess case expresses the correct interpretation of the statute, then clearly the releases constitute a bar to the plaintiffs' action.

It is my own view that there is no conflict between the public policy of the statute and the equally well-established policy of the law to encourage the amicable adjustment of disputes by arms' length negotiation. I find nothing in the statute which prohibits the settlement of such a past-due claim, especially if the amount paid in settlement is at least equal to the unpaid over-time compensation.

The parties had a genuine dispute and having settled it, the plaintiffs repudiate the settlement, but tenaciously hold on to the benefits received. If they win, they will collect the liquidated damages. If they lose, they, nevertheless, retain the over-time compensation to which they are not entitled. I do not believe that it is the intention of the statute to drive so wide a breach between law and morals.

Giving effect to the releases, in this case, does not encourage the violation of the Act; it does not permit the parties to accomplish by settlement a lower rate of compensation than they could have agreed upon prospectively. It throws no obstacle whatever in the path of the fullest accomplishment of all the humane and economic purposes contemplated by Congress in the enactment of the Act.

It is a very proper question whether by this decision I leave one door ajar through which planned violation of the law may be admitted. I have reflected on that matter and have not succeeded in contriving a supposititious case where such a result would be induced. Ingenuity, of course, is an unfathomed well. It is possible that evidence may be presented in such a posture as to suggest the form of a genuine accord when in fact there is none. But the courts have a long experience in detecting the sham which poses as the true. Perhaps, if I were sustaining a compromise providing for the payment of a lesser amount than that which is directed by Section 7 of the Act, the argument of policy might be advanced. See Guess v. Montague, supra.

The plaintiffs had the option of bringing suit and taking the risk of recovering nothing or avoiding that risk by the acceptance of a compromise proposal. Having exercised their option and pocketed the price of the release executed and delivered by them I see nothing in the law which compels the courts to permit them to play "heads I win, tails you lose".

The assertion of this claim is sharp practice, offensive to every moral instinct, and assiduous search of the Statute fails to reveal anything which renders it fair or legal.

Under the circumstances, in the absence of a showing of mistake or overreaching, I see no reason why the courts should not leave the parties in the place where they have voluntarily put themselves. In

the view I have taken of the defenses of accord and satisfaction and release, I find it unnecessary and indeed inadvisable to pass on the question of coverage, except to indicate that it presents a genuine issue with respect to which I am by no means certain that the plaintiffs have established a prima facie case.[1]

It follows that the complaint must be dismissed.

[1] The total rentable area during the period in question was approximately 150,000 square feet. Defendant has conceded that three tenants were engaged in the production of goods for commerce to a substantial extent. The percentage of total rentable area occupied by these tenants was as follows: 1939—4.1%; 1940—4.2%; 1941—4.6%. In addition, by a generous appraisal of the testimony, I have found the following tenants to be similarly engaged to a substantial degree: Bass, L. and E. Beilinson, Rieback, Chessin and Schiff. The space occupied by these tenants represented the following percentages of total rentable area: 1939—3.6%; 1940—4.0%; 1941—5.7%. The sum of these percentages is as follows: 1939—7.7%; 1940—8.2%; 1941—10.3%. If the percentages are calculated on the total rented area instead of the rentable area, they are slightly increased.

These ratios relate to space and not to activity. The ultimate question is, of course, whether "a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described", Walling v. Jacksonville Paper Company, 1943, 317 U.S. 564, 572, 63 S.Ct. 332, 337.