## D. A. SCHULTE, INC. *v.* GANGI ET AL.

No. 517.   Argued March 1, 1946.—Decided April 29, 1946.

*Edwin A. Falk* argued the cause for petitioner. With him on the brief was *Abraham Friedman*.

*Isidore Entes* argued the cause and filed a brief for respondent.

*Solicitor General McGrath, William S. Tyson, Bessie Margolin* and *Joseph M. Stone* filed a brief for the Administrator of the Wage and Hour Division, United States Department of Labor, as *amicus curiae,* urging affirmance.

MR. JUSTICE REED delivered the opinion of the Court.

The issues brought to this Court by this proceeding arise from a controversy concerning overtime pay and liquidated damages under the Fair Labor Standards Act of 1938. Under § 7 (a), the employer is required to pay for

excess hours of work not less than one and one-half times the regular rate.[1] An employer who violates this subsection is liable to his injured employees in the amount due and unpaid and in an additional equal amount as liquidated damages.[2]

The primary issue presented by the petition for certiorari is whether the Fair Labor Standards Act precludes a bona fide settlement of a bona fide dispute over the coverage of the Act on a claim for overtime compensation and liquidated damages where the employees receive the overtime compensation in full. As the conclusion of the Circuit Court of Appeals on this issue in this case[3] conflicts with that of the Fourth Circuit in *Guess* v.

---

[1] 52 Stat. 1063:

"SEC. 7. (a) No employer shall . . . employ any of his employees who is engaged in commerce or in the production of goods for commerce—[longer than the maximum workweek]

.        .        .        .        .

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

[2] 52 Stat. 1069:

"SEC. 16. (b) Any employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

[3] *Gangi* v. *D. A. Schulte*, 150 F. 2d 694. See also *Fleming* v. *Warshawsky & Co.*, 123 F. 2d 622, 626.

*Montague,* 140 F. 2d 500, 504–505, and the Fifth Circuit in *Atlantic Co.* v. *Broughton,* 146 F. 2d 480, we granted certiorari in order to determine the issue which was not passed upon in *Brooklyn Bank* v. *O'Neil,* 324 U. S. 697, 702–704, 708, note 21. 326 U. S. 712.[4]

Respondents were employed by petitioner as building service and maintenance employees in its twenty-three story loft building in the garment manufacturing district of New York City during the period October 24, 1938, to February 5, 1942. Each put in varying hours of overtime for which no payment had been made prior to our decision in *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, on June 1, 1942, by which service and maintenance employees in buildings tenanted by manufacturers producing for interstate commerce were held to be covered by the Wage-Hour Act. Shortly thereafter respondents made claims for overtime pay and liquidated damages which were refused by petitioner on the ground, admittedly true, that its tenants did not ship the products they produced directly in interstate commerce but delivered them to distributors or producers in the same state who thereafter used the products of petitioner's tenants for interstate commerce or the production of goods for that commerce. Under threat of suit, petitioner paid the overtime compensation and obtained a release under seal signed by the

---

[4] In view of the number of settlements for violations, the issue is of importance. See Annual Report, Wage and Hour and Public Contracts Divisions, U. S. Department of Labor, fiscal year ending June 30, 1945, p. 2:

> "In the six years and nine months that the Fair Labor Standards Act had been in force through the end of the fiscal year, about $85,000,000 in restitution of illegally withheld wages had been agreed to or ordered paid to almost two and a half million workers in more than 110,000 establishments, with more than two-fifths of the cases involving failure to pay the minimum wage of 40 cents an hour or less."

several respondents. It is set out below.[5] Petitioner computed the amount of overtime and respondents raise no question as to its accuracy. Respondents then brought this suit in the District Court to recover liquidated damages due them under § 16 (b) of the Act. It was stipulated that the liquidated damages, due if recoverable, were certain stated amounts which corresponded to the overtime compensation already paid. Petitioner denied that it was covered by the Act and pleaded affirmatively, as a defense, the releases which it asserted were obtained in settlement of a bona fide dispute as to coverage.

The District Court held that there was a good accord and satisfaction and release of all claims for liquidated damages because there was a bona fide settlement of a bona fide dispute. It specifically refused to pass upon the defense that the Act did not cover the respondents except to indicate that it presented a difficult issue. 53 F. Supp. 844. This judgment was entered prior to our decision in the O'Neil case. The Circuit Court of Appeals reversed. That court thought the O'Neil case substantially determined that a bona fide compromise of a dispute as to coverage was invalid. Its conclusion as to the invalidity of such compromises was in accord with its prior comments that the liability of unpaid overtime compensation and liquidated damages is single and "is not discharged in toto by paying one-half of it." Rigopoulos v. Kervan, 140 F. 2d 506, 507; Fleming v. Post, 146 F. 2d 441, 443.

Petitioner urges that the theory of a single liability of the employer to the employee under § 16 (b) is unsound

_____

[5] "The undersigned, an employee of D. A. Schulte, Inc., in premises 575 Eighth Avenue, New York City, does hereby acknowledge receipt of the sum of $. . . . . . as payment in full of all sums, if any, which may be due to the undersigned by said D. A. Schulte, Inc. by reason of the Federal Wage & Hour Act, and the undersigned does hereby release said D. A. Schulte, Inc. of and from any other or further obligations in connection therewith."

and that this Court should not find a lack of power in employers and employees to settle amicably controversies over coverage and amounts due for violations of the unpaid minimum wage or unpaid overtime compensation under §§ 6 and 7 of the Act. Petitioner reasons on its first contention that there were two claims—one for overtime compensation and the other for an equal amount as liquidated damages—and that the payment for the first in full was sufficient consideration for the release of the second. On its second contention, petitioner advances the argument that since the congressional intent to forbid compromises of such claims is not clear, such a sharp departure from the traditional policy of encouraging the adjustment instead of the litigation of disputes cannot be inferred from the purposes of the Act. Petitioner points out that a seaman may release his claims under statutes enacted for his protection in a bona fide settlement [6] and that settlement of accrued claims is permitted under the Federal Employers' Liability Act.[7] Petitioner adds that in doubtful cases it may be advantageous to the employee to compromise, that to force litigation may disrupt employer-employee relationships, and that numerous compromise settlements have been made for less than full liability.[8]

[6] *Garrett* v. *Moore-McCormack Co.*, 317 U. S. 239.

[7] *Mellon* v. *Goodyear*, 277 U. S. 335.

[8] Attention is called by petitioner to the failure in this case of the Administrator of the Wage and Hour Division, United States Department of Labor, as amicus curiae, to take the position that compromise payments in cases of disputed coverage are invalid. The Administrator is charged with responsibility for the administration of the Act. Petitioner cites from the Administrator's brief (p. 20) in the *O'Neil* case to show the government position the following excerpt: "The factors which we have mentioned suggest, to us, the difficulty and perhaps the inadvisability from the standpoint of the policy of the

We do not find it necessary to determine whether the liability for unpaid wages and liquidated damages that § 16 (b) creates is unitary or divisible.[9] Whether the liability is single or dual, we think the remedy of liquidated damages cannot be bargained away by bona fide settlements of disputes over coverage. Nor do we need to consider here the possibility of compromises in other situa-

---

Act of framing a sweeping generalization that all releases of liquidated damages are either valid or invalid." That brief called attention also (pp. 19–20) to government practice upon violations of the Act by contractors with cost-plus contracts with the War and Navy Departments:

> "If it is decided by the contracting agency, the Administrator, or on appeal by the Assistant Attorney General, that the employee should prevail, the United States Attorney handling the case is directed to negotiate a tentative settlement with the employee's counsel for submission to the contracting agency for acceptance or rejection. The wages due are of course always paid, but the claim for liquidated damages is the subject of bargaining, and almost invariably the employee's counsel is willing to accept considerably less than the total amount of liquidated damages. After payment of the amount agreed on, a judgment is entered dismissing the suit with prejudice, thereby preventing the employee from seeking to recover more on the same claim."

Settlements of controversies under the Act by stipulated judgments in this Court are also referred to by petitioner. *North Shore Corp.* v. *Barnett*, 323 U. S. 679.

Petitioner draws the inference that bona fide stipulated judgments on alleged Wage-Hour violations for less than the amounts actually due stand in no better position than bona fide settlements. Even though stipulated judgments may be obtained, where settlements are proposed in controversies between employers and employees over violations of the Act, by the simple device of filing suits and entering agreed judgments, we think the requirement of pleading the issues and submitting the judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties. At any rate, the suggestion of petitioner is argumentative only as no judgment was entered in this case.

[9] See *Dize* v. *Maddrix*, 324 U. S. 697, 701–2, 713.

tions which may arise, such as a dispute over the number of hours worked or the regular rate of employment.[10]

The reasons which lead us to conclude that compromises of real disputes over coverage which do not require the payment in full of unpaid wages and liquidated damages do not differ greatly from those which led us to condemn the waivers of liquidated damages in the *O'Neil* case. We said there, 324 U. S. at 708:

> "The same policy which forbids waiver of the statutory minimum as necessary to the free flow of commerce requires that reparations to restore damage done by such failure to pay on time must be made to accomplish Congressional purposes. Moreover, the same policy which forbids employee waiver of the minimum statutory rate because of inequality of bargaining power, prohibits these same employees from bargaining with their employer in determining whether so little damage was suffered that waiver of liquidated damage is called for."

In a bona fide adjustment on coverage, there are the same threats to the public purposes of the Wage-Hour Act that exist when the liquidated damages are waived. The damages are at the same time compensatory and an aid to enforcement. It is quite true that the liquidated damage provision acts harshly upon employers whose violations are not deliberate but arise from uncertainties or mistakes as to coverage. Since the possibility of violations inheres in every instance of employment that is covered by the Act, Congress evidently felt it should not provide for variable compensation to fit the degree of blame in each infraction.[11] Instead Congress adopted a mandatory re-

[10] See *Strand* v. *Garden Valley Telephone Co.*, 51 F. Supp. 898, 904–5.

[11] *Brooklyn Savings Bank* v. *O'Neil, supra*, 713; *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, 397; *Adkins* v. *Children's Hospital*, 261 U. S. 525, 563.

quirement that the employer pay a sum in liquidated damages equal to the unpaid wages so as to compensate the injured employee for the retention of his pay.[12]

It is realized that this conclusion puts the employer and his employees to an "all or nothing gamble," as Judge Chase phrased the result in his dissent below. Theoretically this means each party gets his just deserts, no more, no less. The alternative is to find in the Act an intention of Congress to leave the adjustments to bargaining at the worst between employers and individual employees or at best between employers and the employees' chosen representatives, bargaining agent or some other. We think the purpose of the Act, which we repeat from the *O'Neil* case was to secure for the lowest paid segment of the Nation's workers a subsistence wage, leads to the conclusion that neither wages nor the damages for withholding them are capable of reduction by compromise of controversies over coverage.[13] Such a compromise thwarts the public policy of minimum wages, promptly paid, embodied in the Wage-Hour Act, by reducing the sum selected by Congress as proper compensation for withholding wages.[14]

The only other material question presented by this certiorari [15] is whether the Wage-Hour Act covers service and

---

[12] *Overnight Motor Co.* v. *Missel*, 316 U. S. 572, 583–84; *Birbalas* v. *Cuneo Printing Industries*, 140 F. 2d 826, 828–29.

[13] Discussions of compromise of liability under the Wage-Hour Act will be found in 45 Col. L. Rev. 798; 14 George Washington L. Rev. 385 and 57 Harv. L. Rev. 257.

[14] *Brooklyn Savings Bank* v. *O'Neil, supra,* 704–5, note 14.

[15] The precise language of the question presented is as follows:

"Whether building maintenance employees are within the protection of the Act if the facts relied on to establish coverage of the employees show only that some of the tenants in the building receive, work on and return in intrastate commerce goods belonging to local owners who are not tenants of the building and that subsequently some of the said goods are sold and shipped by such non-tenant owners in interstate commerce, there being no proof

maintenance employees of a building that is tenanted by occupants who receive, work on and return in intrastate commerce goods belonging to non-occupants who subsequently in the regular course of their business ship substantial proportions of the occupants' products to other states.[16] It is agreed by petitioner and respondents that if certain tenants are included as producers for interstate commerce the occupants of the building who are engaged in production for interstate commerce are sufficiently numerous and productive to bring the maintenance em-

---

either that at the time of production such tenants had any knowledge of the ultimate destination of the goods worked on by them or that at the time of production the non-tenant owners had any prior orders or agreements to sell and ship any part of the completed goods in interstate commerce."

[16] No problem involving the soundness of the Wage-Hour standards to guide its enforcement of the Act is involved. We express no opinion on that question. As a working hypothesis the Wage-Hour Administration assumes that when as much as twenty per cent of a building is occupied by firms substantially engaged in production for commerce, then it is likely that maintenance employees will be covered. Release PR–19 (rev.), Nov. 19, 1943, Wage-Hour Division, U. S. Department of Labor. The Circuit Court of Appeals applied this rule with the result that it decided none of the respondents was covered by the Act prior to January 1, 1940. 150 F. 2d 694, 696–97. It decided that all the respondents were covered by the Act beginning January 1, 1940, because more than twenty per cent of the tenants then were engaged in the production of goods for commerce. No review of the first ruling is sought by respondents. Petitioner did not question the soundness of the twenty per cent standard in its petition for certiorari or brief.

As no question is made in petition for certiorari or brief as to the propriety of the action or the power of the Circuit Court of Appeals in determining the kind of activity, state or interstate, that the petitioner's tenants carried on, rather than returning the case to the District Court for a finding of fact, we pass the question without inquiry and without intimation of our understanding of the proper procedure. Compare the majority and dissenting opinions in 150 F. 2d 694.

ployees of the building within the coverage of the Act. *Gangi* v. *D. A. Schulte,* 150 F. 2d 694, note 5. That is, petitioner's building then would be in the same classification, so far as the coverage of its maintenance employees by the Wage-Hour Act is concerned, as were the buildings in *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, and *Borden Co.* v. *Borella,* 325 U. S. 679. We then would have no problem as to the business of the tenants, that is, whether they were producers for interstate commerce, such as was involved in *10 East 40th Street Co.* v. *Callus,* 325 U. S. 578. While the Wage-Hour Act covers employees engaged in the production of goods for commerce, a maintenance employee working for a building corporation which furnishes loft space to tenants can hardly be so engaged unless an adequate proportion of the tenants of that building are so engaged. *Kirschbaum Co.* v. *Walling,* 316 U. S. at 524; *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 572.

Our inquiry, therefore, is narrowed to a determination of whether or not these certain tenants of petitioner, twelve in number, are producing goods for interstate commerce. These tenants manufactured articles for non-tenant New York City business organizations, which organizations subsequently sold the articles in interstate commerce. The Circuit Court of Appeals held as to them, 150 F. 2d 697: [17]

---

[17] Petitioner says as to this finding: "The sole basis in the record for this finding is that the manufacturers for whom the said twelve tenant-contractors worked eventually disposed of some of their goods in interstate commerce. No evidence was offered and no attempt was made to prove that at the time when any of the additional twelve tenants worked on goods belonging to the manufacturers, such manufacturers had an order or an agreement or contract for the shipment of the goods, when completed, in interstate commerce. There was no testimony by any of the twelve tenants that they knew or had reason

"And the testimony clearly shows that at the time of production these tenants had at the very least reasonable grounds to anticipate that their products would move in other states. This is all that had to be shown to constitute them interstate producers. *Warren-Bradshaw Drilling Co.* v. *Hall,* 317 U. S. 88, 92; *United States* v. *Darby,* 312 U. S. 100, 118. . . ."

Petitioner asserts that for four of the twelve there was no evidence that any of them knew at the time of production or later that their products were to be shipped interstate and that the proper characterization of these four tenants, as producers or non-producers for interstate commerce, is decisive of the liability of petitioner. Without detailing the factual situation which makes the position of these four tenants decisive of liability, we assume petitioner's conclusion that its liability depends upon the proper characterization of the four tenants in respect to their position as producers for interstate commerce. We assume that the other eight are in the same category of tenants.

Petitioner relies upon *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 569, as indicating that evidence of a pre-existing understanding by a manufacturer of the interstate destination of his products is essential. But that case was concerned with whether a wholesaler's employees who handled stock were in commerce, not whether they were engaged in the production of goods for commerce.[18] On that basis distinctions were made, as to employees handling goods locally, between a wholesaler's stock pur-

---

to believe that the goods worked on by them would be shipped in interstate commerce. In fact, there was no evidence, in the case of four of the twelve tenants, that any of them knew, either at the time of production or at any time thereafter, or even upon the trial, that the goods worked on by them were eventually shipped in interstate commerce."

[18] Compare *McLeod* v. *Threlkeld,* 319 U. S. 491.

chased on prior order extra-state for delivery intrastate and other stock purchased extra-state and warehoused for subsequent sale and local handling. We find nothing in the case that lends any support to the suggestion that a manufacturer's intrastate delivery to a wholesaler or distributor or other manufacturer for further processing for ultimate interstate distribution interrupts production for interstate commerce.

The burden of proof that rests upon employees to establish that they are engaged in the production of goods for commerce must be met by evidence in the record. *Warren-Bradshaw Drilling Co.* v. *Hall,* 317 U. S. 88, 90. The record shows this building is at 571–583 Eighth Avenue, Borough of Manhattan, City of New York. The testimony of many witnesses shows that the tenants were predominantly, if not entirely, engaged in work for the garment trades. We will take judicial notice, as a matter of common knowledge, that New York City produces more garments for interstate shipment than any other city in the Nation. Eleven of the twelve tenants were contractors who furnished labor on goods sent in to them so as to produce clothing articles eventually distributed in interstate commerce. The twelfth was a manufacturer with offices, salesroom and shipping rooms elsewhere in New York. There was no specific evidence that the four contractors, upon whose status petitioner bases his argument, ever knew that their goods were intended to be or eventually were shipped interstate. There is clear evidence that each business organization for which these four tenants did produce these clothing articles shipped a major proportion of the articles so produced by these tenants in interstate commerce in the regular course of their business. The production of these articles by the tenants for nontenants was the regular business of the tenants. The shortest occupancy of space by any of the four was five years and eleven months.

From these facts, we think the conclusion of the Circuit Court of Appeals that these tenants had reasonable grounds to anticipate that material quantities of their production would move interstate is well supported. It is not essential that individual products should be traced. It is sufficient that, from the circumstances of production, a trier of fact may reasonably infer that a producer has grounds to anticipate that his products will move interstate.[19]  Certainly if these tenants had not only manufactured but had also shipped their products interstate, no one would doubt that they were producers for commerce.  Mere separation of the economic processes of production for commerce between different industrial units, even without any degree of common ownership, does not destroy the continuity of production for commerce. Producers may be held to know the usual routes for distribution of their products.  All this is made plain by the citations of the Court of Appeals to the *Darby* and *Bradshaw* cases.

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE BURTON concurs, dissenting.

Substantially for the reasons given by Judge Rifkind, 53 F. Supp. 844, I would restore his judgment in the District Court and reverse that of the Circuit Court of Appeals.  For purposes of judicial enforcement, the "policy" of a statute should be drawn out of its terms, as nourished by their proper environment, and not, like nitrogen, out

---

[19] Compare *Dize* v. *Maddrix*, 144 F. 2d 584; *Culver* v. *Bell & Loffland*, 146 F. 2d 29; *St. John* v. *Brown*, 38 F. Supp. 385, 388; *Fleming* v. *Enterprise Box Co.*, 37 F. Supp. 331, aff'd 125 F. 2d 897; *Bracey* v. *Luray*, 138 F. 2d 8.

of the air. Before a hitherto familiar and socially desirable practice is outlawed, where overreaching or exploitation is not inherent in the situation, the outlawry should come from Congress. To that end, some responsibility at least for a broad hint to the courts, if not for explicitness, should be left with Congress.

When on other occasions Congress has desired to forbid arrangements made in good faith, it has known how to express its will. When it has not said so in words, it has said so in effect by the very thing it has required, as, for instance, when it made tariffs filed with the Interstate Commerce Commission the fixed measure of transportation charges and forbade discrimination. 24 Stat. 379, 380, as amended; 49 U. S. C. § 6 (7). Of course that precludes discrimination by contract. *E. g., Pittsburgh, C., C. & St. L. R. Co.* v. *Fink,* 250 U. S. 577. The Fair Labor Standards Act affords no comparable basis for the Court's decision in this case. Nothing is discernible in anything that Congress has said or done to imply the prohibition of a settlement made by parties in good faith, not for the minimum wages but a settlement affecting the penalizing double liability where any liability was fairly in controversy when the settlement was made. The severity of the penalties imposed and the legitimate differences regarding the scope of the Act, inherent in its terms, *cf. Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 520, 523, only serve to underline the impolicy of attributing to Congress a purpose reflected neither in any specific provision of the statute nor in the scheme of the legislation. Strict enforcement of the policy which puts beyond the pale of private arrangement minimum standards of wages and hours fixed by law does not call for disregard of another policy, that of encouraging amicable settlement of honest differences between men dealing at arm's length with one another.