CRUZ TULIER OLIVERA, Plaintiff and Appellee, *v.* PUERTO RICO LAND AUTHORITY, Defendant and Appellant.

No. 9801. Argued May 2, 1949.—Decided July 13, 1949.

---

250

*Ramón Gandía Bizcombe* and *Antonio Riera* for appellant. *F. Fernández Cuyar* for appellee. *Ramón A. Cancio,* Counsel for the Commissioner of Labor as *amicus curiae.*

MR. JUSTICE TODD, JR. delivered the opinion of the Court.

Again another governmental agency of The People of Puerto Rico, defendant-appellant, the Land Authority of Puerto Rico, asks us to decide [1] that it is exempt from compliance with the Minimum Wage Act [2] and with the eight working hours Act,[3] since, according to the Act creating it,[4] it is not an entity engaged in commerce, industry, agriculture or any other lucrative business and also, because in any case, plaintiff herein, as an ex-timekeeper of defendant, was its representative or agent, and as such, falls within the definition of "employer" contained in § 30 of the Minimum Wage Act, as amended by Act No. 217 of May 11, 1945.[5]

The Commissioner of Labor of Puerto Rico asked leave, which was granted, to intervene before this Court as *amicus curiae* to sustain the validity of that portion of the judgment ordering the Land Authority to pay to the plaintiff a penalty equivalent to the sum which was awarded him for unpaid

---

[1] In *Lebrón* v. *Aqueduct Service,* 68 P.R.R. 1, the agency involved was the Insular Aqueduct and Sewer Service of Puerto Rico.

[2] Act No. 8 of April 5, 1941.

[3] Act No. 49 of August 7, 1935, Second Special Session.

[4] Act No. 26 of April 12, 1941.

[5] This Section, in its pertinent part, provides:

"Section 30.—The following definitions of words and phrases in this Act shall be accepted, unless otherwise deduced from the context thereof:

".      .      .      .      .      .      .      .      .      .

" 'Employer' includes every natural or artificial person of any kind, whether or not for profit, who employs any number of workmen, laborers, or employees or allows them to work, for any kind of remuneration: and includes the chief, functionary, manager, official, promoter, administrator, superintendent, foreman, overseer, agent, or representative of said natural or artificial person.

".      .      .      .      .      .      .      .      .      .

" 'Workman', 'employee', or 'laborer' includes any natural person who exercises, discharges, or performs any art, trade, employment, or work, under the orders or for the benefit of another, or on the basis of a contract of lease of services, or through remuneration of any kind or an express or tacit promise to receive it, in any industry, business, or occupation."

wages, under § 25 of the Minimum Wage Act, as amended by Act No. 451 of May 14, 1947.[6]

In the complaint it was alleged and accepted in the answer, that plaintiff "was employed by defendant as timekeeper in the 'Mucarabones' farm, owned and operated by defendant, which is one of the so-called proportional-profit farms, situated in Mucarabones Ward of the Municipality of Toa Alta, Puerto Rico."

Plaintiff also alleged that he had worked, in addition to the daily eight working hours, extra hours for which he did not receive compensation from July 1944 to April 1947, nor for the days of rest and vacations to which he was entitled. The lower court made, among others, the following findings:

"1. That petitioner herein worked for the Land Authority of Puerto Rico from Friday, September 8, 1944, until Thursday, May 15, 1947. (Defendant's Exhibit b, list of payments certified by the Auditor of Puerto Rico).

"2. That during that time petitioner herein earned the following wages: from September 8, 1944 until March 29, 1945, $19.00 a week; from March 30, 1945 until January 23, 1947, $20.61 a week; from January 23, 1947 until May 15, 1947, $22.50. (Defendant's exhibit b, list of payments certified by the Auditor of Puerto Rico).

"3. That petitioner's work-week consisted of six days a week, for even if he might have worked some odd Sunday during the grinding season, the same has been amply offset by the reduction of work during the dead season.

"4. That petitioner's task consisted in preparing the tickets for the cages of the various wagons, pay envelopes, list of materials and the worker's weekly payroll.

---

[6] This Section, in its first paragraph, provides:

"Section 25.—Every laborer or employee who receives for his work a compensation different from or lower than that fixed for any industry, business, or occupation, in accordance with this Act or any decree, regulation, resolution, or order of the board, shall be entitled to recover through a civil action the unpaid difference up to the total amount of the compensation to which he is entitled, plus an amount equal to the unpaid amount, as an additional penalty, besides the costs, expenses, and attorney's fees in the proceedings, said fees to be a reasonable amount in no case less than fifty (50) dollars, all this irrespective of any agreement to the contrary."

"5. That petitioner's task, as revealed by the evidence of both parties, justified an extra work of two hours daily during five days a week and four extra hours on Thursday of each week."

The Court stated in its conclusions of law that the Minimum Wage Act as well as Mandatory Decree No. 3 of the Minimum Wage Board referring to the sugar industry, applied to the Land Authority.

And, computing the number of extra hours worked at the rate of the corresponding wage, it adjudged defendant to pay to plaintiff $1,671.70, plus an equal amount of $1,671.70 as the penalty established by § 25 of Act No. 8 of April 5, 1941, as amended by No. 451 of May 14, 1947, and $200 as attorney's fees.

In our opinion, the trial court did not err in holding that plaintiff, as timekeeper of defendant, was not its agent or representative, and as such, comprised in the definition of employer contained in § 30, *supra*, since as we decided in *Chabrán v. Bull Insular Line*, 69 P.R.R. 250, 256, in interpreting the scope of § 4 of Act No. 49 of 1935, which contains a similar definition of the word employer, the representative or agent referred to in these statutes, "is not an employee who performs routine manual or clerical labor. Rather he is someone who acts and speaks for the employer on matters requiring the exercise of judgment. For example, an employee who had other employees working under him whom he had the power to hire and fire would probably fall in this category."

The work entrusted to plaintiff, as shown by the evidence, consisted in preparing: (1) the payrolls of the laborers of Mucarabones farm, (2) the lists of materials used, (3) the tickets for the various cages of the cane wagons, and in order to prepare the payrolls he had to oversee the farm twice a day and check the number of laborers working. The fact that, incidentally, if a worker was absent from a certain place, he could send someone else, as testified by a witness of the

defendant, does not mean that he had the power to hire and fire employees on defendant's behalf. As a matter of fact no one worked under his orders, nor could he decide on the manner in which the workers had to perform their task. And even assuming, without deciding, that in that particular instance he was a representative of the employer, that fact by itself did not divest plaintiff of his status as employee under the definition contained in § 30, *supra*, and as such, entitled to the benefits of the Minimum Wage Act. Even though in *Chabrán* v. *Bull Insular Line*, *supra*, we discussed and decided this question, in view of the fact that a governmental agency, such as appellant herein, cites this case as authority in support of its contention, we deem it convenient to cite additional authorities consistent with said decision, which, of course is not favorable to appellant.

In *American Steel Foundries* v. *National Labor Rel. Bd.*, 158 F. 2d 896, 898 (C.C.A. 7, 1946), two employees were involved: a foreman and a "chief departmental clerk in timekeeping department"—apparently this last position is quite similar to that of a timekeeper—which the company maintained should be considered as included within the definition of employer contained in § 2 of the National Labor Relations Act (29 U.S.C.A. 162), to the effect that: "The term 'employer' includes any person acting in the interest of an employer, directly or indirectly". The court, citing the definition of the word "employee" included in said Section to the effect that "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer", decided that any person employed by petitioner "acts in the interest of the employer. The act of the lowliest employee if done in the course of his employment may bind the employer. We think the statute meant that only the personnel that acted in the interest of the employer in matters envisaged by the Act would be considered to be in the employer status. Whenever a supervisory worker, whether

high or low in the managerial hierarchy, acts in the interests of the employer, that is, carries out the employer's known policy toward the organizational activities of its workers, as for instance in opposition to unionization in general or in favor of a company union, such supervisory worker may take on the complexion of his employer. [Cases] Such conduct of a supervisory worker does not mean that he has lost his status as an employee. It means only that the consequences of his acts may be visited upon his employer, and in that sense only does such worker occupy an employer status. . ." (Single quote ours).

This was the same conclusion reached by us in the *Chabrán* case, *supra*, pp. 253–255 and footnote 1, wherein we called attention to the fact that under the Insular Labor Relations Act, when defining the word "employee", the "executives or supervisors" were specifically exempted, but that exemption was not carried over into Act No. 49 of 1935 involved in that case. Neither was that exemption made in § 30 of the Minimum Wage Act, *supra*. For further discussion on this point see: *Packard Co.* v. *Labor Board*, 330 U. S. 485; *Labor Board* v. *Atkins & Co.*, 331 U. S.·398; *Board* v. *Hearst Publications*, 332 U. S. 111; *National Labor Relations Board* v. *Armour & Co.*, 154 F.2d 570 (C.C.A. 10th, 1946); *Rich* v. *Puget Sound Bridge & Dredging Co.*, 156 F. 2d 334 (C.C.A. 9th, 1946) and Annotation in 169 A.L.R. 435.

■ Appellant nevertheless argues that it is not subject to the provisions of Act No. 49 of 1935 as to the eight-hour working day and, consequently, not subject either to the payment for the extra hours worked by its employees, in view of the fact that the Land Authority is not a commercial, industrial or agricultural enterprise for profit, since § 1 of said Act, provides, in its pertinent part, that "no person shall be employed or shall be permitted to work in any commercial, industrial, or agricultural establishment or in any other lucrative business more than eight (8) hours during any nat-

ural day. . ." Appellant also contends that we should revise anew our decision in *Lebrón* v. *Aqueduct Service, supra*, for that case was improperly decided, as the question presented and to be decided was not whether the Aqueduct and Sewer Service of Puerto Rico is exempt by the law creating it or of any other law whatsoever, from keeping and complying with the provisions regulating working hours, but that the question to be decided there, as well as in this case, is whether that Service, in this case the Land Authority, was and is a commercial establishment, an industry or a business for profit.

Appellant is wrong. In the *Lebrón* case, *supra*, we said, at p. 5, that we did not deem it necessary "to consider or determine whether or not the defendant corporation is a lucrative enterprise or business, *since we think that in either case* the laws regulating the salaries and conditions of work are applicable to the Aqueduct and Sewer Service of Puerto Rico." (Italics ours). We said this after analyzing Act No. 40 of May 1, 1945, creating the Aqueduct and Sewer Service of Puerto Rico and specially § 5(b) which provides that "The wage rates and other terms and conditions of employment in the Service shall be not lower in compensation and, on the average, not less favorable to the interests of the employee than the wages, terms and conditions prevailing for work of a similar nature in the community in which said work is performed."

We shall then examine the Act creating the Land Authority in order to determine whether the Legislature expressed in any way its intention in such an important matter as this. It is an accepted fact that the farm in which plaintiff was working in one of the so-called proportional-profit farms under Title IV and regulated by §§ 64 to 73 of Act No. 26 of 1941, *supra*.

Paragraph (b) of § 65 of the Act as amended by Act No. 202, approved May 15, 1943, provides:

"(*b*) That laborers working on that part of the farm not ceded with these parcels shall receive for each day's work or part thereof, as an advance, *the regular wage commonly paid in that particular zone, or that which may be stipulated by law,* and each laborer shall be entitled to receive, on a specified date or dates each year, a proportional part of the net profits of the farm in proportion to the wages or salary he has received as an advance on his labor on said farm. This provision of the contract shall include not only the laborers having parcels on the farm, but all such laborers as well who at any time may work on the farm by order of the lessee. *The Authority shall include in all contracts of lease of this nature, a clause providing that the legal working days shall be in effect on farms, and directing the lessee to pay for extra hours of work according to legislation in force."* (Italics ours).

How can it be maintained with a ring of reason that if the Land Authority is bound to include in every lease contract of a proportional-profit farm a clause providing that the legal working day of eight hours, shall prevail and ordering the lessee to pay for extra hours of work according to existing legislation, this same Land Authority, when as in the instant case, one of its employees is involved, shall not be bound to comply with existing legislation on the legal working day and to pay for extra hours? We cannot impute to the Legislature of Puerto Rico the intention of exempting the Land Authority from compliance therewith merely because the Authority is not a commercial, industrial or agricultural enterprise for profit. Even if it were not—cf. *The People of Porto Rico* v. *Eastern Sugar Associates,* 156 F. 2d 316, 325 (C.C.A. 1st, 1946)—the provisions of §§ 65(*b*), *supra,* and 67 of Act No. 26 of 1941, as amended, *infra,* in our judgment, expressly compel it to comply with existing legislation on hours and wages.

To that effect, if for any reason the Authority operated one of the proportional-profit farms, which is not the case here, § 67 of the Act provides:

"Section 67.—During any period in which the Authority may have to administer directly a proportional-profit farm, because of the expiration of the lease, *or for any other reason, the laborers shall continue to receive the same benefits as if the farm were under the management of a lessee,* including those laborers who may have parcels of said farm in usufruct, both as regards said parcels and *as regards salaries,* wages or advances and the proportional part of the net profits of the farm corresponding to each one." (Italics ours).

Therefore the intention of the Legislature to the effect that the Authority is bound to comply with existing legislation on hours and wages, is clear. Any other interpretation would mean to deprive the laborers and employees of the Land Authority from the benefits of this Act of social character. We are convinced that this was not the legislative intent.

■■ Appellant further contends that the lower court erred in imposing the penalty provided in § 25 of the Minimum Wage Act, *supra,* and argues that the same deprives it of its property without due process of law and denies it the equal protection of laws, all of this in violation of the provisions of the Fifth Amendment of the Constitution of the United States and of § 2 of the Organic Act of Puerto Rico. To support its contention, it cites *St. Louis I. M. & S. Ry. Co. v. Wynne,* 224 U. S. 354, and *Chicago, Mil. & St. Paul Ry. Co. v. Polt,* 232 U. S. 165.

It is in connection with this alleged error that the Commissioner of Labor has intervened as *amicus curiae,* praying that we sustain the validity of the penalty imposed on the Land Authority. Even though the *amicus curiae* might have intended to limit his intervention, it is obvious that if he favors the legality of the penalty imposed, he accepts *a fortiori* that the Land Authority is liable for the payment of the wages earned by plaintiff for extra hours worked, since the penalty, if proper, is in consequence of the original judgment against it. We say this because we do not under-

stand why the Commissioner of Labor has limited the scope of his intervention in this case if we take into consideration the fact that § 25 itself of the Act provides that "in every action or judicial proceeding instituted by any person *in connection with the enforcement of this Act*, or of a decree, regulation, resolution, or order of the board, the Commissioner may become a plaintiff or an interventor", with no limitation whatsoever. (Italics ours).

The principal contention of appellant as to this error is that since appellee claimed in his complaint $5,350.12 as unpaid wages, when the court only acknowledged his right to receive $1,671.70, we must conclude "that there was no obstinacy on the part of defendant-appellant in defending itself from a claim by all means excessive and unjust."

Section 16(*b*) of the Fair Labor Standards Act, 29 U.S.C.A. § 216 (*b*), p. 255, provides in its pertinent part that "Any employer who violates the provisions of section 206 or section 207 of this title [these Sections refer to minimum wages and maximum laws of work] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as *liquidated damages*. . ." (Brackets and italics ours). In *Cardona* v. *District Court*, 62 P.R.R. 59, 68, 69, we held that § 25 of Act No. 8 of 1941 had been borrowed from the Federal statute when it provided, originally, that the worker had a civil action to claim his wages "plus an amount equal to fifty (50) per cent of the unpaid amount as an additional penalty." It was by the 1947 amendment, *supra*, that the penalty was raised to a sum equal to that obtained in the judgment. In the same case of Cardona, p. 73, we cited the case of *Overnight Motor Co.* v. *Missel*, 316 U. S. 572, in which it was decided that the "liquidated damages" in the Fair Labor Standards Act "are compensation, not a penalty or punishment by the Government." It is true that although

in various instances in the opinion in the *Cardona* case we made reference to § 25 of Act No. 41 of 1941, we also specifically stated in footnote 2, that "any references to Act No. 8 of 1941 in this opinion have been simply by way of example. It would not be appropriate for us in this case to pass on the scope or validity of that statute or any provision thereof." It is now that we face the problem of deciding whether the "penalty" imposed by § 25, *supra*, is mandatory and, if so, is applicable to the facts herein and whether it is unconstitutional as alleged by appellant.

If we compare § 16 (*b*) of the Fair Labor Standards Act, *supra*, with § 25 of our statute, we shall notice that the former does not contain the closing phrase of the latter to the effect that the laborers or employees may claim their unpaid wages, plus the penalty "irrespective of any agreement to the contrary." Notwithstanding this, by judicial interpretation of § 16 (*b*) of the Federal Act, *supra*, it has been held that the "liquidated damages" referred to in said Section may not be waived by the laborers and employees— *Brooklyn Bank* v. *O'Neill*, 324 U. S. 697—nor can they be the object of a compromise or adjustment of a bona fide dispute as to whether the Act is applicable or not in such a way as to relieve the employer from the obligation to pay them. *Schulte Co.* v. *Gangi*, 328 U. S. 108.

The main ground for these decisions rests on the fact that "liquidated damages" are of a mandatory character because of the question of public policy involved. In *Schulte Co.* v. *Gangi*, *supra*, at pp. 115–16, the court said:

"The reasons which lead us to conclude that compromises of real disputes over coverage which do not require the payment in full of unpaid wages and liquidated damages do not differ greatly from those which led us to condemn the waivers of liquidated damages in the *O'Neill* case. We said there, 324 U. S. at 708:

"'The same policy which forbids waiver of the statutory minimum as necessary to the free flow of commerce required

that reparations to restore damage done by such failure to pay on time must be made to accomplish Congressional purposes. Moreover, the same policy which forbids employee waiver of the minimum statutory rate because of inequality of bargaining power, prohibits these same employees from bargaining with their employer in determining whether so little damage was suffered that waiver of liquidated damage is called for.' "

In a bona fide adjustment on coverage, there are the same threats to the public purposes of the Wage-Hour Act that exist when the liquidated damages are waived. The damages are at the same time compensatory and an aid to enforcement. It is quite true that the liquidated damage provision *acts harshly upon employers whose violations are not deliberate but arise from uncertainties or mistakes as to coverage.* Since the possibility of violations inheres in every instance of employment that is covered by the Act, Congress evidently felt it should not provide for variable compensation to fit the degree of blame in each infraction. Instead *Congress adopted a mandatory requirement that the employer pay a sum in liquidated damages equal to the unpaid wages so as to compensate the injured employee for the retention of his pay.*

"It is realized that this conclusion puts the employer and his employees to an 'all or nothing gamble,' as Judge Chase phrased the result in his dissent below. Theoretically this means each party gets his just deserts, no more, no less. The alternative is to find in the Act an intention of Congress to leave the adjustments to bargaining at the worst between employers and individual employees or at best between employers and the employees' chosen representatives, bargaining agent or some other. We think the purpose of the Act, which we repeat from the *O'Neill* case was to secure for the lowest paid segment of the Nation's workers a subsistence wage, leads to the conclusion that neither wages nor the damages for withholding them are capable of reduction by compromise of controversies of coverage. Such a compromise thwarts the public policy of minimum wages, promptly paid, embodied in the Wage-Hour Act, by reducing the sum selected by Congress as proper compensation for withholding wages." (Italics ours).

On a better footing we must hold that the additional penalty imposed by § 25, *supra*, of our Act, is mandatory when our Legislature expressly provided that all workers or em-

ployees when claiming unpaid wages shall have the right to an equal amount, as an additional penalty, "irrespective of any agreement to the contrary."

The fact that in our Act it is called an "additional penalty" is no bar to our considering the so-called "additional penalty" as an additional compensation, just as the United States Supreme Court considered that the "liquidated damages" of § 16(b), *supra*, were not a penalty but a compensation. The purpose of this provision is not to penalize the employer but to compensate the employee for wages that he should have received in due time. *Newman* v. *George A. Fuller Co.*, 48 A. (2d) 345. In *Brooklyn Bank* v. *O'Neill, supra*, pp. 707–8, the intention of Congress in approving the Federal Act is clearly expressed:

"We have previously held that the liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages. *Overnight Motor Co.* v. *Missel*, 316 U. S. 572. It constitutes a Congressional recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency and general well-being of workers' and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being. Employees receiving less than the statutory minimum are not likely to have sufficient resources to maintain their well-being and efficiency until such sums are paid at a future date."

As the *amicus curiae* correctly states in his brief, we should not "presume that our Legislature, in enacting § 25 of the Minimum Wage Act, exercised less zeal for reasons of public policy to protect our workmen, whose wages and living standards are lower than those of the workmen in the continent, than did Congress for the same reasons of public policy in enacting § 16(b) of the Federal Labor Standards Act."

██ Appellant argues that it was not obstinate in trying to defend itself from a claim of $5,350.12 when the judgment only acknowledged in plaintiff the right to receive $1,671.70; that it acted in good faith and consequently, that the penalty should not have been imposed. The answer to this argument is contained in that portion of the *Schulte Co.* v. *Gangi* case, *supra*, where it is stated that "It is quite true that the liquidated damage provisions acts harshly upon employers whose violations are not deliberate but arise from uncertainties or mistakes as to coverage. Since the possibility of violations inheres in every instance of employment that is covered by the Act, Congress evidently felt it should not provide for variable compensation to fit the degree of blame in each infraction." Section 25, *supra*, being mandatory, the absence of obstinacy or the good faith on the part of the employer is no defense, and once it is established that the worker did not receive, in due time, all the wages to which he was entitled, courts are bound to concede a sum equivalent to that which he did not receive. When the United States Congress wished to circumvent the outcome of the opinion in *Schulte Co.* v. *Gangi, supra*, it did so expressly by approving the so-called Portal-to-Portal Act of May 14, 1947, ch. 52, 61 Stat. 84, 29 U. S. C. A. §§ 251 to 262, authorizing the waiver of adjustment of workers' claims under certain conditions (29 U.S.C.A. § 253) and the plea of good faith on the part of the employer was established if he alleged and proved that he acted according to a ruling, order or administrative interpretation of any agency of the United States or any administrative practice of any such agency (29 U.S.C.A. § 258) or if he proved that he acted in good faith and if he had reasonable grounds to believe that his act or omission was not a violation of the Act, the court may, in its discretion, refrain from conceding liquidated damages or conceding a lesser sum than that set forth in § 16(*b*), (29 U.S.C.A. § 260).

But our Legislature, in amending § 25, *supra*, in 1947, expressly provided that the penalty should be imposed "irrespective of any agreement to the contrary". Although it is true that subsequently when approving Act No. 379 of May 15, 1948, establishing the working day in Puerto Rico, and repealing No. 49 of 1935, *supra*, it authorized under § 13 thereof [7] judicial and extra-judicial transactions in these cases, it did so with the limitation that the Commissioner of Labor should intervene therein. Section 25, *supra*, still has, therefore, a mandatory character, notwithstanding the lack of obstinacy or the good faith on the part of the employer, in the absence of facts that might make it inapplicable under Act No. 379 of 1948.

The cases of *St. Louis I. M. & S. Ry. Co.* v. *Wynne*, and *Chicago, Mil. & St. Paul Ry. Co.* v. *Polt*, cited by appellant, are, in our judgment, clearly inapplicable to the facts of the present case. They deal with a penalty imposed in addition to the damages proved during the trial and not to the penalty involved in § 25, *supra*, as liquidated damages, because these are not susceptible of proof.

The remaining errors assigned by appellant refer to the weighing of the evidence by the lower court, and to the ap-

---

[7] This Section, in its pertinent part, provides:

"Any employee who receives a compensation less than that fixed by this Act for regular hours and extra hours of work shall be entitled to recover from his employer, through civil action, the sums unpaid, plus an equal sum as liquidation of damages, in addition to costs, expenses, and attorney's fees of the proceeding.

".     .     .     .     .     .     .     .     .     .     .     .

"The judicial claim may be filed by one or several employees, in his or their names, and that of other employees who are in similar circumstances: *Provided, That after the claim has been judicially instituted, it may be settled by compromise between the parties with the intervention of the Commissioner of Labor and the approval of the court.*

"*Every extra judicial compromise* in regard to the payment of the wages for regular hours, extra hours of work, or the payment of the sum equal to that claimed which this Act fixes as liquidation of damages, shall be null; *Provided, however, That for the purposes of this Act a compromise made before the Commissioner of Labor or any of the attorneys of the Department of Labor, appointed by said Commissioner, shall be valid.*" (Italics ours).

parent incongruence in the use of a phrase in its opinion in connection with the other findings of fact. We have examined the transcript of the evidence in detail, and appellee's evidence, which was believed by the court, is sufficient to support the judgment, which should be affirmed.