Edward DAMRON, et al., Plaintiffs,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.

No. 1:93 CV 1325.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 17, 1995.

loss as a result of excessive noise exposure while working for the defendant.

## I. *BACKGROUND*

Mr. Heffner began working for defendant in 1955 as a car cleaner. (Heffner dep. p. 20.) His job was held for him from 1957 to 1959, while he spent time in the military. (Heffner dep. p. 22–23.) Upon his return, Heffner resumed his work as a car cleaner, became a car repair helper in 1967, became a car man in 1971, and shortly thereafter became a car inspector. (Heffner dep. pp. 25, 27–30.) Mr. Heffner left the railroad in 1990 pursuant to a voluntary separation program through which the railroad made lump sum payments to certain employees in exchange for their leaving the company. As a condition of participation in the program, the plaintiff entered into a "Resignation and Release," which provides as follows:

H. Brann Altmeyer, Phillips, Gardill, Kaiser, Boos & Hartley, Wheeling, WV, Robert N. Pierce, Jr., Louis A. Raimond, Robert N. Pierce, Jr. & Associates, Pittsburgh, PA, Robert P. Sweeney, Stephen C. Foley, Robert J. Steele, Jr., Law Offices Of Robert E. Sweeney, Cleveland, OH, for Edward Damron, Paul A. Stover.

I, R.E. HEFFNER, (SS# 277–30–4382), in consideration of the sum of FORTY THOUSAND THREE HUNDRED SEVENTY–SEVEN DOLLARS AND 60/100 CENTS ($40,377.60), the receipt of which is hereby acknowledged, hereby resign and surrender any right to employment by Norfolk Southern Corporation, Norfolk and Western Railway Company, Southern Railway Company and any employer affiliated with or controlled by any of the aforenamed companies, for convenience referred to hereinafter individually and collectively as the "Company", and hereby release and forever discharge the Company and its agents, officers and employees from any claim (with the exception of vested pension rights), demand, action or cause of action, of any kind whatsoever, known or unknown, which I have or could have on account of, or in any manner arising out of or connected with, my employment by the said Company, or the termination thereof, including but not limited to any claim or right asserted under or arising out of any agreement, regulation, condition or statute affording me employment protection, protecting me from employment discrimination, or covering the conditions of my employment.

Robert N. Pierce, Jr., Louis A. Raimond, Mark Coulter, Robert N. Pierce, Jr. & Associates, Pittsburgh, PA, Robert P. Sweeney, Stephen C. Foley, Robert J. Steele, Jr., Law Offices of Robert E. Sweeney, Cleveland, OH, for John Hale, Robert Heffner, Paul F. Hensley, Robert Kennell, and James F. Knipp.

H. Brann Altmeyer, Phillips, Gardill, Kaiser, Boos & Hartley, Wheeling, WV, Robert N. Pierce, Jr., Louis A. Raimond, Robert N. Pierce, Jr. & Associates, Pittsburgh, PA, for Leonard Metz.

Sheila Anne McKeon, Forrest A. Norman, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, for Norfolk and Western Railway Company.

## ***ORDER***

SAM H. BELL, Judge.

Now before the court are plaintiff's objections, (docket # 79), to Magistrate Judge Hemann's Report and Recommended decision on defendant's motion for summary judgment, (docket # 14). Plaintiff, Robert Heffner, filed the underlying action pursuant to the Federal Employers' Liability Act (FELA/the Act), 45 U.S.C. § 51 et seq., claiming that he suffered permanent hearing

(Defendant's ex. 1.)

At the time plaintiff signed this release, he claims that he was unaware that he had

experienced a hearing loss as a result of his employment. (Heffner dep. pp. 32–33.) Mr. Heffner subsequently filed the instant lawsuit to recover for this injury. The defendant now moves for summary judgment based upon its contention that the release plaintiff executed at the time of his separation from employment bars the instant action.

Magistrate Judge Hemann agreed with the defendant, finding that the "Resignation and Release" absolved the defendant from liability for plaintiff's hearing loss. Because the Magistrate Judge discerned no reason to set aside the release, she recommends that the court grant defendant's motion for summary judgment. Plaintiff has lodged his objections to the report and recommendation, (docket # 79), and the defendant its response, (docket # 85). This court has conducted its de novo review and has concluded, for the reasons which follow, that summary judgment is improper.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

■■■ The Court of Appeals for the Sixth Circuit recently summarized the standard of review governing motions for summary judgment under Federal Rule of Civil Procedure 56:

> Summary judgment is appropriate where "there is no genuine issue of material fact ... and the moving party is entitled to judgment as a matter of law." .... [The] court must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party.
>
> The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.
>
> "By its very terms, this standard provides that the existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict in favor for the nonmoving party. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted."

*LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993) (citations omitted). With this standard in mind, the court shall analyze the defendant's present motion, the Magistrate Judge's recommendations regarding that motion, and plaintiff's and defendant's objections to the report and recommendation.

## III. LAW AND ANALYSIS

### A. The Federal Employers' Liability Act

Plaintiff brings the instant action under the FELA to obtain compensation for his alleged work-related noise induced hearing loss. Since the early 1900s, the FELA has enabled railroad employees such as Mr. Heffner to recover for injuries sustained in the performance of their duties. The FELA's enactment arose out of Congress's dissatisfaction with the then existing common-law duties implicit in the master-servant relationship, *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 507, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957), and the resulting "prodigious burden" personal injuries imposed on employees engaged in industry and commerce. H.R.Rep. No. 1386, 60th Cong., 1st Sess. 2 (1908). Congress sought to "change the common-law liability of employers of [railroad] labor ... for personal injuries received by employees in the service." *Id.* at 1. Thus, "Congress crafted a federal remedy that shifted part of the "human overhead" of doing business from the employees to their employers," *Consolidated Rail Corp. v. Gottshall,* ─── U.S. ───, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), and "put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations." *Wilkerson v. McCarthy,* 336 U.S. 53, 68, 69 S.Ct. 413, 420–21, 93 L.Ed. 497 (1949) (Douglas, J., concurring). The

portion of the FELA creating such liability provides as follows:

> Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce....

45 U.S.C. § 51.

In order to effectuate the FELA's imposition of liability, Congress understood the need to do more than enact provisions permitting employees to sue—it perceived a duty to ensure that the employees' suits would not be defeated by the same devices which Congress perceived to have been used in the immediate past by the railroads to avoid liability. In fact, the statute's "main purpose was to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions." *Lewy v. Southern Pacific Transp. Co.*, 799 F.2d 1281, 1287 (9th Cir.1986) (citing *Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807, 813 (7th Cir.1985)). To that end, the FELA rejects contributory negligence in favor of comparative negligence, abolishes the use of assumption of the risk, and forbids employers from avoiding FELA liability through contract. 45 U.S.C. § 53–55.

### B. *Prohibition of Agreements Exempting Railroads from FELA Liability*

At the time of the FELA's enactment, many railroads "insist[ed] on a contract with their employees, discharging the company from liability for personal injuries." H.R. Rep. 1386, 60th Cong., 1st Sess. 6 (1908). The effect of such contracts was to completely deprive injured employees of their rights to actions at law. S.Rep. No. 400, 60th Cong., 1st Sess. 3 (1908). Consequently, section five of the FELA, 45 U.S.C. § 55, limits a railroad's ability to escape liability using such contracts by providing that

> [a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void....

45 U.S.C. § 55.

Section five withstood a challenge to its constitutionality early in its history. In *Mondou v. New York, N.H. & H.R. Co.*, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327 (1912), the Supreme Court rejected an argument that section five amounted to an unwarranted interference with the liberty to contract and a violation of the Fifth Amendment to the United States Constitution. The court concluded that "if Congress possesses the power to impose liability, which we here hold that it does, it also possesses the power to insure its efficacy by prohibiting any contract, rule, regulation or device in evasion of it." *Mondou*, 223 U.S. at 52, 32 S.Ct. at 176.

Soon after announcing the validity of section five in *Mondou*, the court considered the impact of section five on a provision that the acceptance of relief fund benefits operated as a release and satisfaction of all claims. *Philadelphia, B. & W. R.R. Co. v. Schubert*, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911 (1912). *Schubert* involved a railroader's suit to recover for personal injuries inflicted by the negligence of a fellow servant. At the time of his injury, Schubert was a member of a relief fund, into which he paid a monthly fee and agreed to abide by the fund's regulations in exchange for promised payments upon his injury or death. The regulations provided that acceptance of benefits would operate as a release of all claims against the company, a provision which the Supreme Court held violated section five. *Id.* at 606–07, 612, 32 S.Ct. at 589–90, 591–92. The court found that section five "includes every variety of agreement or arrangement ... and [that a] stipulation, contained in contracts of membership in relief departments, that acceptance of benefits thereunder shall bar recovery, are within its terms." *Id.* at 611, 32 S.Ct. at 591. But for the stipulation in the relief fund agreement, the railroad would have been bound under the FELA to pay for Schubert's injuries. Thus, the court reasoned that the provision was included by defendant in order to immunize itself from liability, and as such, was condemned by section five. *Id.*

While *Schubert* dealt with the invalidity of contracts releasing an employer from its FELA liability made prior to an injury, that decision did not control agreements made after the injury occurred. *Duncan v. Thompson*, 315 U.S. 1, 4, 62 S.Ct. 422, 423, 86 L.Ed. 575 (1942). It is now well settled, however, that section five also bars agreements entered into long after the employee is injured. *Id.* at 5–7, 62 S.Ct. at 423–25.

In *Duncan v. Thompson*, 315 U.S. 1, 62 S.Ct. 422, 86 L.Ed. 575 (1942), an injured employee accepted $600 for living expenses, but agreed to return the money before he filed suit in the event that his claims could not be settled. *Id.* at 3, 62 S.Ct. at 422. The parties did not settle, and the employee brought suit without first returning the $600. The railroad argued for dismissal based upon this failure, while plaintiff maintained that the condition ran afoul of section five. *Id.*

After deciding that section five comprehends post-injury contracts, the court turned to whether Duncan's contract in particular violated the statute. The agreement between Duncan and the railroad allegedly created a condition precedent to his bringing suit by requiring him to first refund the $600. The court noted that

> unless this condition were satisfied—and in view of Duncan's straitened circumstances the probability of satisfaction would seem negligible—Duncan's only means of enforcing such liabilities as should have been assumed by the respondent would be taken from him. Hence, the agreement, if valid, would effectively exempt the respondent from liability under the act no matter what the merits of Duncan's claim.

*Id.* at 7, 62 S.Ct. at 424.

The court took up the question of the effect of section five on the compromise of disputed claims, as well as the validity of accompanying agreements not to sue, in *Callen v. Pennsylvania R.R. Co.*, 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242 (1948). Mr. Callen brought a FELA action for a work-related back injury. After he was injured, he "executed a general release of 'all claims and demands which I have or can or may have against the said Pennsylvania Railroad Co. for or by reason of personal injuries sus-

tained by me' at the time and place involved in the suit." *Callen*, 332 U.S. at 626–27, 68 S.Ct. at 297. Defendant raised this release as a defense to plaintiff's suit and plaintiff argued that the release violated section five of the FELA, and therefore, was ineffective as a bar to subsequent action pursuant to the Act. *Id.* at 631, 68 S.Ct. at 298–99. The Supreme Court rejected plaintiff's argument, finding that the compromise and settlement of plaintiff's claim, and the accompanying release of further claims, did not amount to a prohibited "device ... to enable ... [the defendant] ... to exempt itself from liability." 45 U.S.C. § 55. In so finding, the court wrote:

> It is obvious that a release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility. Where controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation.

*Callen*, 332 U.S. at 631, 68 S.Ct. at 298–99. The court later explained that in *Callen*, they "distinguished a full compromise enabling the parties to settle their dispute without litigation ... [which does not] contravene the Act, from a device which obstructs that Liability Act plaintiff to secure that maximum recovery if he should elect judicial trial of his cause." *Boyd v. Grand Trunk Western R.R. Co.*, 338 U.S. 263, 266, 70 S.Ct. 26, 28, 94 L.Ed. 55 (1949).

### C. *Heffner's Resignation and Release*

Mr. Heffner filed this action pursuant to 45 U.S.C. § 51, the provision of the FELA making railroads liable in damages for their employees' injuries suffered in the course of employment. Defendant argues that plaintiff's action is barred by the resignation and release he signed upon his separation from employment which provides, in part, that the plaintiff will "release and forever discharge that company ... from any claim ... in any manner arising out of or connected with" his employment. Defendant contends that this release enjoins Mr. Heffner from bringing any work-related claims whatsoever, and on that basis, moves for summary judgment.

Plaintiff maintains that the release is invalid and, accordingly, that it does not bar the instant action. Plaintiff attacks the release on several grounds. He argues first, that the terms of the release are ambiguous, then, that the release was entered into based upon a mutual mistake of fact, and finally, that the release was not supported by consideration. Plaintiff further contends that any portion of the resignation and release which might be read to release defendant from FELA liability violates section five of the Act, thus negating the bar which the release might otherwise impose on the instant action.

With respect to the question of ambiguity, plaintiff argues that the language of the release is susceptible to more than one reasonable interpretation. The court is of the opinion that the release at issue in this case is not susceptible to varying interpretations. The resignation and release agreement contains the following clear language: "I ... hereby release and forever discharge the Company ... from any claim ... whatsoever ... which I have or could have on account of, or in any manner arising out of or connected with, my employment ...."

The court also agrees with Magistrate Judge Hemann's determination that plaintiff's assertions of mutual mistake and lack of consideration fail as a matter of law. Any mistake was unilateral, not mutual, and plaintiff undeniably received something of value for execution of the resignation and release. There remain, then, only the questions concerning whether any portion of the release violates section five of the FELA, as an otherwise valid release may still be ineffective to the extent that it violates the FELA.

The agreement which Mr. Heffner signed purports to discharge the defendant forever from liability for any claims arising out of plaintiff's employment. Plaintiff asserts that insofar as the resignation and release shields defendant from FELA liability, the release is void under section five. We repeat here the words of section five:

> [a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void....

45 U.S.C. § 55. Defendant maintains that the resignation and release agreement was not an attempt to "exempt itself from liability" in violation of section five. Rather, defendant claims that it entered into the agreement in an attempt to settle all claims with employees separating from the company. As such, defendant maintains that the release is not prohibited by the FELA.

■ Defendant accurately indicates that a settlement of disputed claims does not contravene section five of the FELA. It does not follow, however, that the resignation and release between Mr. Heffner and the railroad represents such a settlement. Thus, it is for this court to determine whether the resignation and release document at issue represents a permissible compromise and settlement, or the type of device to exempt from FELA liability prohibited by section five.

In *Callen v. Pennsylvania R.R. Co.,* 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242 (1948), the Supreme Court first held that a compromise and settlement of claimed liability does not run afoul of section five. *Callen* involved a situation in which a man was injured, and he later negotiated a settlement with his employer, a settlement which included a release of his claims arising out of the incident which caused the injury. Thus, in *Callen* there existed a specific claim, a compromise of that claim, and a concurrent release of future claims. It is this kind of settlement which the court held did not violate section five of the FELA. *Callen,* 332 U.S. at 631, 68 S.Ct. at 299.

Mr. Heffner entered into the resignation and release in question as a part of a voluntary separation program initiated by the defendant. Once defendant decided to offer the voluntary separation program, it mailed information packages describing the program to selected employees. Those employees were offered a lump sum payment, less taxes, plus certain medical and death benefits. Employees desiring to participate then submitted applications, which the defendant could then reject or accept. Upon determination of which applications it would accept, defendant prepared the necessary materials,

and passed them along to the employees' supervisors so that the employees could receive their checks and sign the necessary documents. (Kirchner dep. p. 39.)

Under the voluntary separation program, each employee was offered the same benefits package, irrespective of whether the employee had a claim or a potential claim against the company. During his deposition, defendant's director of economics, Marcellus Kirchner, gave the following answers to the following questions pertaining to the benefits received by employees participating in the voluntary separation program:

A. The separation benefits are not contingent upon the existence or lack thereof of any particular claim, and so everyone who separates under this program receives the same package of separation benefits depending on their eligibility.

Q. So everyone who receives separation payment under this program receives the same amount of money whether they're suffering from a personal injury or not; correct?

A. As I said before, the amount of money is not contingent upon their injury status, nor is it contingent upon their labor claim status.

Q. So my question to you then is, if two employees had signed the same agreement, they both receive the $50,000 whether one has a personal injury claim and the other has not? They both receive the same amount of money; correct?

A. Both employees that participate in the program receive the same amount of money, and they're both participating under the same terms and conditions; i.e., they sever their employment relationship and extinguish all pending claims against the company or any future claims.

Q. So if an employee has a broken back, has a lawsuit that's pending against the company, then he gets the same $50,-000 as somebody who is perfectly healthy and has no claim; correct?

A. That's correct.

(Kirchner dep. pp. 105–06.) In further questioning regarding other claims that might arise, Kirchner indicated that whether a claim arises from something like a specific traumatic incident or asbestos exposure, the language of the release was designed to "extinguish" the claim. (Kirchner dep. pp. 117–18.) "The intention of the resignation and release is to extinguish employees' seniority and all employment rights, as well as any and all claims of any nature whatsoever that the employee may have against the company, whether it be personal injury or labor claims or anything else." (Kirchner dep. p. 40.) The "existence of personal injury claims or any other kind of claim has no bearing upon the benefits [an employee] would receive." (Kirchner dep. p. 95.)

The evidence before the court indicates that the railroad from time to time found it economically advantageous to seek the voluntary separation of a large number of employees, because once gone, the union contract did not require the railroad to replace them. Thus, the railroad would benefit from a lower employment cost. To obtain the separation, the railroad would fix an amount which it believed would convince the desired number of employees to leave, and then would solicit applications offering each eligible employee the same consideration for their resignation. In order to separate and receive payment, these employees were required to release defendant from all employment related claims. Admittedly, however, the value of the individual claims from which the employees released the defendant did not factor into the package each employee received upon separation.

This court has difficulty fathoming how a release obtained under such circumstances could be construed as a *compromise.* Defendant insists, however, that it was attempting to *"settle* any and all claims ...[and] [f]or this, ... paid approximately $30 million." Defendant claims that "a railroad has every right when it pays such vast sums of money to conclude all employment rights including claims known or unknown." (Defendant's Memorandum in Opposition to Plaintiff's Objections to Magistrate's R & R pp. 12–13.) Defendant's rights, however, are measured by the law as enacted by Congress and interpreted by the United States Supreme Court. No amount of money can change the fact that

the law prohibits devices exempting covered employers from FELA liability.

The FELA, a statute written to put the railroads at some cost to those injured while in their service, states that "[a]ny contract . . . or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability . . . shall . . . be void." 45 U.S.C. § 55. The resignation and release entered into with Mr. Heffner falls squarely within this prohibition. Defendant tries to take itself out of the statutory prohibition by explaining its mass solicitation of releases as an attempt to settle, thereby trying to fit itself within the exception to section five recognized in *Callen v. Pennsylvania R.R. Co.* However, in *Callen* the Supreme Court indicated that "where controversies exist as to whether there is liability," *Callen*, 332 U.S. at 631, 68 S.Ct. at 299, "a full compromise enabling parties to settle their dispute without litigation," *Boyd*, 338 U.S. at 266, 70 S.Ct. at 28, will not violate section five. Evidence of the circumstances in which Mr. Heffner's release was procured indicates that no controversy yet existed regarding liability, and certainly, that no compromising occurred.

The FELA contains a clear prohibition against devices operating to exempt an employer from FELA liability. 45 U.S.C. § 55. According to the Supreme Court's interpretation, this prohibition does not forbid releases of claims pursuant to "compromise[s] of claimed liability . . . where controversies exist as to whether there is liability." *Callen*,

332 U.S. at 631, 68 S.Ct. at 299. This court concludes, however, that defendant's obtaining plaintiff's release pursuant to the voluntary separation program involved no such compromise.[1]

Section five "declares a policy to void releases or other exculpatory devices procured under an attempt to avoid Federal Employers' Liability Act liability." *Kozar v. Chesapeake and Ohio Ry. Co.*, 320 F.Supp. 335, 384–85 (W.D.Mich.1970), aff'd in part, vacated in part, 449 F.2d 1238 (6th Cir.1971) (reversing district court, but indicating that the court correctly set forth the policies underlying the FELA). In circumstances such as these, permitting an employer to procure, even for substantial consideration, a release of all possible future claims is inconsistent with such policies.

A reading of 45 U.S.C. § 55 indicates that Congress intended to remove the ability of employees to sell off their FELA rights in exchange for short term gains as well as the ability of employers to pressure or defraud their employees into signing away those same rights. Granted, releases have been held valid under 45 U.S.C. § 55, see *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242 (1948), but the rationale for that holding was that "a release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility." *Id.* at 631, 68 S.Ct. at 298.

1. This conclusion distinguishes this court's resolution of this matter from that of Magistrate Judge Hemann and the other Judges in the Northern District of Ohio who have adopted her recommendations regarding the type of release here in question. Magistrate Judge Hemann examined the validity of the resignation and release under section five of the FELA and accurately discerned that the critical question before her was whether the release represented a fair compromise of the plaintiff's FELA claims. In making her determination in this regard, she examined several relevant issues, but she never directly explored whether the parties had come to the type of compromise which would take the release out of section five's prohibition. This court concludes that such a compromise of claimed liability did not occur.

The Magistrate Judge also perceived the instant release as one through which the railroad

"bought its peace" by paying for a release of *all* claims, including those which had not yet accrued. In doing so, she relied primarily upon a Fourth Circuit case, *Virginia Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262 (4th Cir.1971), in support of her conclusion that releases barring known and unknown claims are enforceable when such releases arise from the severance of a relationship with no known disputes. *Virginia Impression* involved a release entered into as a part of the termination of a dealership, which acted as a bar to a subsequent antitrust action. Because *Virginia Impression* was not a FELA case, the circuit court did not consider the special limitations on releases under the FELA, namely those in section five. Consequently, this court finds *Virginia Impression* inapplicable to the instant case.

*Brophy v. Cincinnati, New Orleans & Texas Pacific Ry. Co.,* 855 F.Supp. 213, 216 (S.D.Ohio 1994).

## IV. CONCLUSION

This court finds that the release Mr. Heffner signed pursuant to his voluntary separation from the railroad does not bar the instant hearing loss claim. The release cannot operate as a bar to plaintiff's hearing loss claim because there is no evidence before the court that the release was procured pursuant to a full and fair compromise of claimed liability.

In light of the facts currently before the court, the court finds that the release, while perhaps valid and binding as to other claims, does not bar plaintiff's current action before this court. Accordingly, defendant's motion for summary judgment, (docket # 14s), is denied.

IT IS SO ORDERED.