

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-29-1998

# Wicker v. Consolidated Rail

Precedential or Non-Precedential:

Docket 97-3034

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Wicker v. Consolidated Rail" (1998). *1998 Decisions.* Paper 95.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/95

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 29, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-3034, 97-3035, 97-3036
97-3037 and 97-3038

EDWARD L. WICKER, SR.,
       Appellant at No. 97-3034

SAMUEL D. WEAVER,
       Appellant at No. 97-3035

THOMAS E. KLEINER,
       Appellant at No. 97-3036

JOHN W. McKEE,
       Appellant at No. 97-3037

JOHN M. KALTENBRUNNER,
       Appellant at No. 97-3038

v.

CONSOLIDATED RAIL CORPORATION

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action Nos. 93-cv-00041J, 94-cv-00015J
94-cv-00036J, 94-cv-00132J and 95-cv-00105J)

Argued September 23, 1997

Before: BECKER, Chief Judge, SCIRICA and McKEE,
Circuit Judges

(Filed: April 29, 1998)

JAMES M. FLOOD, ESQUIRE
(ARGUED)
HOWARD S. STEVENS, ESQUIRE
Stevens & Johnson
740 Hamilton Mall
Allentown, Pennsylvania 18101

 Attorneys for Appellants

STEPHEN M. HOUGHTON, ESQUIRE
(ARGUED)
PETER T. STINSON, ESQUIRE
Dickie, McCamey & Chilcote
Two PPG Place, Suite 400
Pittsburgh, Pennsylvania 15222-5402

 Attorneys for Appellee

OPINION OF THE COURT

SCIRICA, Circuit Judge.

The issue on appeal is whether S 5 of the Federal Employers' Liability Act1 voids a general release of claims given as part of a negotiated settlement.

I.

A.

Plaintiffs Edward Wicker, Sr., Samuel Weaver, Thomas Kleiner, John McKee and John Kaltenbrunner are all former employees of defendant Consolidated Railroad Corporation who were injured during the course of their

_____

1. Section 5 of FELA provides:

 Any contract, rule, regulation, or device whatsoever, the purpose or
 intent of which shall be to enable the common carrier to exempt
 itself from any liability created by this chapter, shall to that extent
 be void . . . .

45 U.S.C. S 55 (1986).

2

employment. Each plaintiff negotiated a settlement of claims with Conrail and executed a release. While the releases were not identical, each appeared to settle all claims for all injuries past and future. Plaintiffs subsequently suffered injuries as a result of exposure to toxic chemicals at Conrail's Hollidaysburg Reclamation Plant in Blair County, Pennsylvania.

B.

Edward Wicker retired from Conrail in 1982. Before retiring, Wicker suffered injuries as a result of exposure to asbestos and, in January 1988, signed a release settling his asbestos related claims. Wicker believed the release related solely to his asbestos injuries, and testified he would not have executed a release with a broader scope. Wicker claims he was also exposed to trichlorethylene and trichloroethane while employed at Conrail, and may have been exposed to other toxic chemicals without his knowledge. Wicker now suffers from blackouts, seizures, vertigo, stiffness in his hands, and burn spots in front of his eyes, all of which he attributes to his exposure to chemicals while employed at Conrail. He does not believe any of his injuries are related to asbestos exposure, the subject of his initial settlement.

Samuel Weaver was employed by Conrail from 1974 until 1991. In February 1989, Weaver severely injured his back on the job. In September 1991, Weaver signed a release and a Letter of Agreement not to return to work. Weaver believed the release related only to his back injury, and said he would not have signed it otherwise. Weaver testified that he was exposed to chemicals during the course of his employment, and alleges that he suffers from swollen eyes, infected tear ducts, nosebleeds, headaches, respiratory difficulties, an enlarged liver, skin rashes, dizziness, lipomas, cracking lips, indigestion, overgrowth of skin on his thumbs, xerodermatitis, shortness of breath, fatigue, black mucous substances in his mouth and nose, foot numbness, muscle cramps, spastic colon and benign lumps. Weaver claims that while some symptoms existed at the time he executed the release, many are recent

3

developments which were not discovered until after he had signed the release.

Thomas Kleiner was exposed to asbestos while employed by Conrail. In August 1992, Kleiner signed a general release. Kleiner's attorney, Robert Kosseff, testified that neither he nor Kleiner were aware at the time the release was executed that Kleiner had been injured by exposure to chemicals other than asbestos. Kleiner said that he was exposed to various chemicals when he worked on a "slop truck," cleaning out vats filled with caustic soda, soaps, cleaners, chlorinated solvents, and other chemical wastes. As a result, Kleiner suffers from respiratory difficulties, black mucous in his nose and mouth, skin rashes, fatigue, headaches, chest pain, numbness, muscle cramps, nose bleeds, coughing and sinusitis.

In April, 1990, John McKee injured his back while working for Conrail and, as a result, was unable to work for approximately two years. He returned to work briefly and before retiring signed a release and letter of agreement on September 11, 1992, similar to those signed by Weaver. At the time he executed the release, McKee was represented by Robert Kosseff, who testified that neither he nor his client was aware that McKee had been injured by exposure to toxic chemicals. McKee suffers from headaches, respiratory difficulties, nausea, light headedness, skin rashes, chronic indigestion, a bleeding stomach ulcer, kidney stones, blood clots, nervous disorder, and dermatitis. Although McKee testified that he had experienced many of these symptoms before executing the release, he explained that hefirst connected his symptoms to chemical exposure after he signed the release.

John Kaltenbrunner injured his back in April 1990 while employed by Conrail. In November 1994, Kaltenbrunner signed a release, and a letter of agreement identical to those signed by Weaver and McKee stating that he would not return to his job. Kaltenbrunner testified he was unaware of his exposure to toxic chemicals during his employment, and that, as a result, he suffers injuries apart from his back injury, including rashes, joint pain, respiratory problems, sinusitis, skin "eruptions," and Legionnaires Disease. Kaltenbrunner also testified that

some of these symptoms manifested themselves before executing the release.

C.

The releases signed by Wicker and Kleiner were similar in form and substance, and appear to release Conrail from liability for all claims, both past and future, relating to their employment. Wicker's release provides, in part:

> I, Edward Wicker . . . for the sole consideration of Twenty-one Thousand Dollars ($21,000) . . . hereby release and hereby discharge Consolidated Rail Corporation . . . from any and all losses, claims, liabilities, actions, causes of action . . . and demands of any kind whatsoever in nature . . . which I have or to which I claim to be entitled by reason of any injuries, known or unknown, foreseen or unforeseen . . . which now exist or which may arise in the future as a result of or in any way connected with my alleged exposure to any material, substance, product, and/or good(s) of any kind or nature (including but not limited to dust, fumes, vapors, mists, gases, agents, asbestos or toxic substances of any kind) supplied or permitted to exist by [Conrail], and/or arising out of any working condition, of any kind, during my employment by [Conrail] . . . .

> I hereby declare and represent that the injuries and illnesses which have been or may be sustained, including mental conditions resulting from asbestos exposure or exposure to any substance, condition or environment or a belief that I was exposed to asbestos, or any substance, condition or environment, are, or may be permanent, and that recovery therefrom is uncertain and indefinite, and that they may cause or lead to other deleterious conditions, including but not limited to cancer, and that in making this Release, it is understood and agreed that I rely wholly upon my own judgment, belief, and knowledge of the nature, extent, effect, duration, and other possible results of said injuries, illnesses, conditions, exposures, and liability therefore, and that the release is made without reliance

5

upon any statement or representation by [Conrail] . . . and that possible future conditions, as yet undetected, including but not limited to cancers of any kind, are included.

McKee and Weaver each signed a standard release form entitled "General Release." These releases provide in part:

I, [Plaintiff] hereby release and forever discharge [Conrail] from all claims, demands, actions and causes of action of every kind whatsoever and including but without limitation of the foregoing, all liability for damages, costs, expenses and compensation of any kind, nature or description now existing or which may hereafter arise from or out of injuries and damages, known or unknown, permanent or otherwise, sustained or received by [plaintiff arising from the specific incident being settled].

The release signed by Kaltenbrunner, while similar to those signed by Weaver and McKee, also contains a separate exclusion preserving his claims for carpal tunnel syndrome. That release provides in part:

I, John M. Kaltenbrunner, for the sole consideration of Fifty Thousand Dollars ($50,000.00) . . . do hereby release and forever discharge [Conrail] from all claims, demands, actions and causes of action of every kind whatsoever and including, but without limitation of the foregoing, all liability for damages, costs, expenses and all incidents, illnesses, diseases, conditions, injuries and damages, known or unknown, permanent or otherwise . . . .

THIS RELEASE SPECIFICALLY EXCLUDES ANY CLAIMS OR CAUSES OF ACTION THAT JOHN KALTENBRUNNER HAS OR MAY HAVE IN THE NATURE OF OCCUPATIONALLY RELATED CARPAL TUNNEL SYNDROME OR OCCUPATIONALLY RELATED REPETITIVE MOTION INJURIES INVOLVING THE UPPER EXTREMITIES ONLY BUT DOES NOT WAIVE ANY SUBSTANTIVE OR PROCEDURAL DEFENSES THERETO.

6

D.

Each plaintiff brought suit under FELA, alleging various injuries because of exposure to hazardous and toxic substances during the course of their employment with Conrail. Conrail sought summary judgment, citing the previously executed releases. Contending the releases barred only their claims for back injury and asbestos exposure, plaintiffs raised contract defenses of mutual mistake, fraud, ambiguity and lack of consideration. They also argued the releases were unenforceable underS 5 of FELA, 45 U.S.C.A. S 55 (1986). The district court consolidated the cases and granted Conrail's motions. This appeal followed.

E.

The able district judge observed that the executed releases "contain language which, on its face, relieves the defendant from future liability for any type of damage or harm suffered by the plaintiffs while in the railroad's employ." Edward L. Wicker, Sr., et al. v. Consolidated Rail Corporation, Civ. Nos. 93-41J, 94-15J, 94-36J, 94-132J, 95-105J (W.D. Pa. December 31, 1996) ("Wicker") at 6. Finding the language of the releases unambiguous and no evidence of mutual mistake, the court rejected plaintiffs' contract defenses. Because plaintiffs were represented by counsel and the releases were negotiated at arm's length, the court also rejected plaintiffs' argument that these were contracts of adhesion.

Addressing plaintiffs' FELA defense, the court acknowledged the split of authority on the enforceability of broadly written releases. It then turned to its recent decision in Wicker v. Conrail, Civ. No. 94-16J (December 19, 1996) ("Wicker II"), which "accorded great weight to the plaintiff 's continuing employment with Conrail after settlement of his [original claim]." Wicker at 18. By contrast, each plaintiff here negotiated his release in the context of terminating, or already having terminated, his employment with Conrail. According to the court, these releases "served the beneficial purpose of adjusting, and providing finality to, all claims between the parties." Id.

7

The district court also looked to Wilson v. CSX Transp. Inc., Civ. No. 91-1398, slip op., (W.D. Pa. March 9, 1994), in which plaintiff sued his employer for shoulder injuries sustained in a work-related accident. Through settlement, plaintiff released his employer from "all claims, suits, [etc.] . . . which the [plaintiff] has or might have against [the railroad] . . . for any and all injuries . . . occurring prior to the date of [the release], including but not limited to injuries arising out of or in any way connected with[the shoulder injury]." Wilson, slip op. at 4. The term "injury" was defined in the release to include both known and unknown injuries. Several years later, plaintiff sued for an occupational hearing loss, arguing the claim was not barred because the release related only to claims arising from the injury to his shoulder, and the hearing loss did not accrue until after the settlement was signed. Granting the railroad's motion for summary judgment, the court noted the release specifically encompassed all injuries occurring prior to the date of settlement, regardless of whether plaintiff was aware of them. The Wilson court also noted the general release at issue "indicates that the parties were settling all known and unknown claims of injury . . . [and] that the parties were severing their relationship for all time and defendant was `buying its peace' with plaintiff as to any such injuries." Wilson at 7.

In addition, the district court here reasoned that the economic motivation behind negotiating a broadly worded release is consistent with the congressional purposes of FELA. The court found that persons who sign general releases tend to receive larger settlements, and that defendants are willing to pay higher sums to settle claims under a general release.2 This, together with plaintiffs' representation by counsel led the court to believe that enforcement of the releases was "in the interest of both parties, when viewed from the time of the negotiating of the agreement." Wicker at 20.

_____

2. "Broadly worded releases negotiated with departing or retired employees, as a matter of economic analysis, do not permit a FELA employer to exempt itself from future liability . . . [because] the liable employer under such a release pays the full discounted value of the known and unknown injuries of the settling parties." Wicker at 20.

F.

On appeal, plaintiffs have abandoned their arguments of mutual mistake, fraud, ambiguity, and lack of consideration. Their appeal relies entirely on the assertion that their executed general releases are void under S 5 of FELA, 45 U.S.C.A. S 55 (1986). Plaintiffs contend they were unaware of either the injuries or the cause of those injuries at the time the releases were executed, and offer supporting affidavits from the attorneys who represented them at the time. The releases are invalid, they claim, because "[u]nder FELA a release is only valid if it compromises a claimed liability." Pls.' Brief at 11. Consequently, S 5 of FELA "prevents workers from releasing claims which they do not know existed at the time they executed a release for a separate known claim." Id. Plaintiffs maintain a general release of unknown and future claims does not bar later claims for injuries unknown at the time the release was executed. Id. at 13 (citing Forry, Inc. v. Neundorfer, Inc., 837 F.2d 259 (6th Cir. 1988)); see also Lanham v CSX Transp. Inc., 1995 WL 368171 (E.D. Pa. June 21, 1995)(finding that a general release executed in settlement of an employee's claim for a back injury did not bar a subsequent claim for an occupational disease of which the employee was unaware when he executed the release).

Conrail relies on the district court's analysis, especially the distinction between current and former employees. Because the releases were executed as part of a settlement of existing claims and the termination of employment, Conrail contends they were meant to put to rest all present and future claims. Conrail also contends plaintiffs' asserted symptoms or injuries existed before they executed the releases. Thus, even if the releases cover only those injuries manifest at the time of settlement, the "new" injuries were nonetheless released because plaintiffs were on notice of a potential health problem at that time.

G.

The district court had jurisdiction under 28 U.S.C. S 1331 and 45 U.S.C. S 51, as well as supplemental jurisdiction under 28 U.S.C. S 1367. We have jurisdiction under 28 U.S.C. S 1291.

9

We exercise plenary review of a grant of summary judgment. Dyszel v. Marks, 6 F.3d 116, 123 (3d Cir. 1993). We apply the same test as the district court. Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975, 978 (3d Cir. 1993). In so doing, we must view all evidence and draw all inferences therefrom in the light most favorable to the non-moving party. Id. In this case, the party attacking the validity of the release bears the burden of proof as to its invalidity. Callen v. Pennsylvania R. Co., 332 U.S. 625, 630 (1948).

II.

A.

In this appeal we must interpret the scope of S 5 of FELA, and in particular, whether its bar of "[a]ny contract . . . the purpose of which shall be to enable [an employer] to exempt itself" from FELA includes a general release of claims executed by an employee as part of a settlement. A brief review of the history of FELA and the accompanying case law is warranted.

In 1908, FELA "was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant." Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 507 (1957). Congress sought to "ensure that the employees' suits would not be defeated by the same devices which Congress perceived to have been used in the immediate past by the railroads to avoid liability." Damron v. Norfolk & W. Ry. Co., 925 F. Supp. 520, 523 (N.D. Ohio 1995). Thus, FELA was designed "to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions." Lewy v. Southern Pac. Transp. Co., 799 F.2d 1281, 1287 (9th Cir. 1986). For example, the Act abolished the doctrine of assumption of risk, applied comparative rather than contributory negligence, and sought to prevent employers from contracting out of FELA liability. See S. Rep. 460, 60th Cong., 1st Sess. 2-3 (1908). With respect to the last of these, Congress noted that many railroads "insist[ed] on a contract with their employees, discharging the company

10

from liability for personal injuries." H.R. Rep. 1386, 60th Cong. 1st Sess. 6 (1908). Section 5 was passed specifically to remedy this problem.

B.

Shortly after FELA's adoption, the Supreme Court began to establish the boundaries of S 5. The Court upheld the validity of S 5 in Mondou v. New York, N.H. & H.R. Co., 223 U.S. 1, 52 (1912), noting that "if Congress possesses the power to impose liability . . . it also possesses the power to insure its efficacy by prohibiting any contract, rule, regulation or device in evasion of it." The same year, the Court examined S 5 in the context of a relief fund agreement by which acceptance of benefits constituted a release of all claims against the employer. Philadelphia, B. & W.R. Co. v. Schubert, 224 U.S. 603 (1912). Reasoning that this stipulation was simply a way for the employer to avoid liability by contract, and that it fell within the scope of S 5, the court held the release violated FELA. Id. at 612.

Although Schubert addressed only agreements signed before injury, the Court later extended the bar to releases signed after injury. Duncan v. Thompson, 315 U.S. 1, 5-6 (1942). In Duncan, the injured employee accepted $600 to cover his living expenses, agreeing to return the money in the event he brought suit against the employer. When the employee filed a claim without first refunding the $600, the railroad raised the contract as a defense. Focusing on whether "the purpose or intent" of the agreement was to enable the employer "to exempt itself from any liability" under FELA, the Court noted that, because of Duncan's financial condition, requiring the refund before commencing suit was tantamount to depriving him of the right tofile suit, thereby exempting the employer from liability. Id. at 7. It also noted the $600 was specifically earmarked for living expenses, and the agreement was a form commonly used to benefit employees until final settlement was negotiated. Id. at 7-8. Consequently, it declined to discuss the validity of a release signed as part of a bona fide settlement, finding that the "very language of the agreement indicates it is not a compromise and settlement." Id.

11

The Court addressed that issue in Callen v. Pennsylvania R. Co., 332 U.S. 625 (1948), where a railroad employee brought a FELA action after injuring his back in a work-related accident. As a defense, the railroad pleaded a general release executed by the employee, signed in exchange for $250, that relieved the railroad of "all claims and demands which [plaintiff] can or may have against the said Pennsylvania Railroad Co. for or by reason of personal injuries sustained." Callen, 332 U.S. at 626. Plaintiff claimed that when he signed the release he was unaware he had a permanent injury. Although the primary issue on appeal was whether the trial judge had improperly withdrawn the question of the release's validity from the jury,3 the Court also addressed whether the release violated S 5 of FELA. Rejecting this argument, the Court said:

> It is obvious that a release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility. Where controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation.

Id. at 631. The language is clear. Releases are not per se invalid under FELA. Although the Court did not explain what will qualify as a "compromis[e] [of] a claimed liability" it did say that parties may settle "[w]here controversies exist as to whether there is liability, and if so for how much." The explicit requirement is that a controversy must exist.

The Court provided some clarification in Boyd v. Grand

_____

3. The Supreme Court held that the validity of the release was a jury question and that the trial judge's misleading instructions had effectively withdrawn the issue from the jury's consideration. The Court also rejected the argument that the burden of proof with respect to validity should be shifted to the railroad, noting that, regardless of the potential inequality of bargaining power between the parties, such a change was appropriately left to the discretion of Congress. Thus, until Congress "adopt[s] a policy depriving settlements of litigation of their prima facie validity . . . the releases of railroad employees stand on the same basis as the releases of others." Id. at 630.

12

Trunk W.R. Co., 338 U.S. 263, 266 (1949), noting that its Callen decision "distinguished a full compromise enabling the parties to settle their dispute without litigation, which we held did not contravene the Act, from a device which obstructs the right of the Liability Act plaintiff to secure the maximum recovery if he should elect judicial trial of his cause." In Boyd, the railroad advancedfifty dollars to its employee twice during the month following his work-related injury. On each occasion, the employee signed an agreement which provided that, if he elected to sue, "such suit shall be commenced within the county or district where I resided at the time my injuries were sustained, or in the county or district where my injuries were sustained and not elsewhere." Id. at 264. The employee brought his claim in a different venue and the employer sued to enjoin the action. Examining the venue provision contained in S 6 of FELA,4 the Supreme Court held"the right to select the forum granted in s. 6 is a substantial right." Id. at 266. Consequently, "contracts limiting the choice of venue" obstruct a FELA plaintiff's fundamental right of recovery, and are therefore "void as conflicting with[S 5 of] the [Federal Employers'] Liability Act."5 Id. at 265.

Despite this ruling, the proper application and reach of S 5 remains unclear. One reason may be that the Court's decisions rejecting general releases as bars to subsequent claims have been fact-driven, and consequently do not provide a generally applicable rule of law. Although the Supreme Court in Callen refused to void the releases

_____

4. Section 6 of FELA provides, in part:

> Under this chapter an action may be brought in a district court of
> the United States, in the district of the residence of the
defendant,
> or in which the cause of action arose, or in which the defendant
> shall be doing business at the time of commencing such action.

45 U.S.C. S 56 (1986).

5. In addition to voiding general releases of FELA claims under S 5, the Court has also held such releases void on the grounds of fraud, Dice v. Akron, Canton & Youngstown R. Co., 342 U.S. 359, 362 (1952), and lack of consideration, Maynard v. Durham & S. Ry. Co., 365 U.S. 160 (1961). Neither holding, however, provides any guidance as to the proper application of S 5.

executed in compromise of an employee's claims, the Court has not had occasion to explain how wide a net its ruling casts. Nonetheless, the case law provides us with some rough guidelines.

C.

To begin with, Schubert underscores that S 5 of FELA was designed to prevent employers from making the waiver of claims a quid pro quo of the employment contract. Unlike this case, Schubert dealt with a release that was signed before the employee was injured, clearly the type of contractual "shield" FELA was designed to prevent. Nonetheless, Schubert makes clear that Congress intended to prevent employers from depriving their employees of the right to recover for job-related injuries.

Duncan and Callen are also instructive. In Duncan the Court began shaping the requirements of S 5, concluding that the release was not part of a compromise and settlement. Callen was more specific and explicitly permitted releases "where controversies exist." Of course the release in Callen addressed only a specific injury.

Boyd holds that a FELA plaintiff may not waive his fundamental rights under the statute.6  But Boyd relied on the specific venue provision in S 6 of FELA to support its conclusion that S 5 prohibited a waiver of venue. As noted, there is no specific section of the statute which addresses the rights of FELA plaintiffs to settle their claims.

_____

6. The Court has held, in the context of the Fair Labor Standards Act, that an employee cannot waive certain statutorily conferred rights. See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 704 (1945) (noting that a "statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy" and thus the plaintiffs could not waive minimum or overtime wages or liquidated damages); D.A. Schulte, Inc. v. Gangi, 328 U.S. 108 (1946) (holding that an employee could not waive his right to liquidated damage, even if the release is made in settlement of a bona fide dispute as to coverage). While it is arguable that this is analogous to an employee waiving his fundamental right to file a FELA claim, making a general release invalid, the Court's decision in Callen would appear to undercut this reasoning.

14

In South Buffalo Ry. Co. v. Ahern, 344 U.S. 367 (1953), the Court upheld a provision of the New York Workers' Compensation Law that effectively allowed an employee to waive its FELA rights. Plaintiff had been awarded $28 per week under the New York Workers' Compensation Law for injuries sustained while employed as a switchman. Two years later, after the employee died -- and his remedy under FELA had lapsed -- the employer attacked the award on the ground that the Workers' Compensation Board did not have jurisdiction. According to the employer, S 113 of the statute, which granted the Board jurisdiction to hear claims for injuries "subject to the admiralty or other federal laws," was unconstitutional as applied because permitting the Board to hear claims covered by FELA constituted a waiver of an employee's FELA rights. The Supreme Court disagreed. Noting that S 113 was permissive, and did not coerce an employee to give up its federal rights, the Court held that S 113 of the New York Workers' Compensation Law did not constitute an impermissible waiver under S 5 of FELA.7

The New York statute at issue in Ahern -- allowing waiver of an employee's FELA claims when he or she receives compensation under the Workers' Compensation Law-- is arguably no different than a private agreement to waive such claims as part of a settlement between the employee and the employer. But the facts of the case counsel against extracting such a clearly defined rule of law. Unlike plaintiffs here, who have filed claims unrelated to their previous injuries, the employee in Ahern received benefits for injuries received in a specific accident only.

_____

7. The Court reviewed another attack on a FELA release in its per curiam decision in Hogue v. Southern R. Co, 390 U.S. 516 (1968). The issue in that case was whether a plaintiff who attacks the validity of a previously executed release must return the consideration paid for that release prior to commencing his FELA action. While the Court did not find it necessary to "decide whether the release here involved violated s. 5," it noted that "a rule which required a refund as a prerequisite to institution of suit would be `wholly incongruous with the general policy of the Act to give railroad employees a right to recover just compensation for injuries negligently inflicted by their employers.' " Id. at 518 (quoting
Dice v. Akron, Canton & Youngstown R. Co., 342 U.S. 359, 362 (1952)).

Consequently, Ahern is closer to Callen, and while it supports the notion that releases are not per se invalid under FELA, it does not shed much light on the validity of the general releases at issue here. To the extent there is a key to understanding this question, it may be found in Callen where the court said parties may settle "[w]here controversies exist as to whether there is liability, and if so for how much."

D.

Not surprisingly, lower courts that have addressed this issue have disagreed on the proper interpretation of S 5. Some courts, including the district court here, have held that general releases do not contravene the purposes of FELA and may bar a subsequent claim. See, e.g., Wilson v. CSX Transp., Inc., Civil Action No. 91-1398, slip op. (W.D. Pa. 1994); Williams v. Norfolk Southern Corp., CA 1:92-CV-545-HTW (N.D. Ga. Jan. 22, 1993); Satterfield v. CSX Transp., Inc., No. 93-002-R (W.D. Va. Dec. 22, 1993). Others have refused to allow a defendant to use a previously executed general release to block a subsequent FELA claim. See, e.g., Babbitt v. Norfolk & Western Ry. Co., 104 F.3d 89 (6th Cir. 1997); Lanham, 1995 WL 368171 (E.D. Pa. June 21, 1995); Manis v. CSX Transp., Inc., 806 F. Supp. 177 (N.D. Ohio 1992).

As we have noted, the district court here gave great weight to the termination of plaintiff's employment. Because the parties severed and terminated their relationship thus "buying [their] peace," the court reasoned the general release of claims signed by plaintiffs barred any subsequent claims for unrelated injuries.

The contrary view has been set forth by the United States Court of Appeals for the Sixth Circuit in Babbitt, and appears to establish a broad, legal rule prohibiting the use of general releases in cases such as this. The plaintiffs in Babbitt were former railroad employees who signed Resignation and Release Agreements as part Norfolk's Voluntary Separation Program. Subsequently, plaintiffs brought FELA claims for occupational hearing loss, and the district court granted defendant's motion for summary

16

judgment, finding the releases barred plaintiffs' claims. The Sixth Circuit reversed, holding that "[t]o be valid, a release must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from the injuries known or unknown by him." 104 F.3d at 93.

Conrail contends that Babbitt is distinguishable on its facts because the releases in Babbitt were part of a "Voluntary Separation Program" which offered early retirement to railroad employees. Rather than the result of compromise of claims, the releases were a take-it-or-leave-it option offered to all employees. By contrast, the releases at issue here were all negotiated as part of the settlement of an existing claim – each was the result of arms-length bargaining between the plaintiff, his counsel, and the defendant railroad. No case cited by plaintiffs prohibiting general releases corresponds to the facts here. In both Lanham, 1995 WL 368171 (E.D. Pa. June 21, 1995), and Manis, 806 F. Supp. 177 (N.D. Ohio 1992), cited by plaintiffs to support a broad reading of S 5, the courts focused on the nature of the releases signed, which were expressly limited to prior injuries and thus were not "general" releases of all claims.

III.

To be valid under FELA, a release must at least have been executed as part of a negotiation settling a dispute between the employee and the employer. Schubert and Duncan hold that a release of FELA claims given as a condition of employment, or signed without negotiation, is void under S 5. As noted, the holding in Babbitt was based in part on the fact that the releases formed part of a voluntary separation program, and were not the product of negotiations settling a claim. See also Damron v. Norfolk & Western Railway Co., 925 F. Supp. 520, 525 (N.D. Ohio 1995).

It is also clear that an employer may not demand a release against potential claims as a condition of employment. The language of S 5 focuses on whether the

17

employer is attempting to evade liability. Schubert invalidates those releases whose only purpose is to deprive employees of their FELA rights. Schubert, 224 U.S. 603 (1912); see also S. Rep. 460, 60th Cong., 1st Sess. 2-3 (1908); H.R. Rep. 1386, 60th Cong. 1st Sess. 6 (1908). But as noted, Callen permits an employer and an employee to negotiate a release of existing claims.

As the district court here noted, and review of the case law confirms, "FELA cases are inherently fact-bound." Wicker at 18. The evaluation of the parties' intent at the time the agreement was made is an essential element of this inquiry. See, e.g., Lanham, 1995 WL 368171 at *1; Forry, 837 F.2d at 263; Manis, 806 F. Supp. at 179. In Lanham, for example, the court's decision turned on its belief that the release was intended to apply to the employee's earlier injury only, and could not bar a claim for subsequent injury. Lanham at *1.8  The Forry court also noted that the "meaning to be given to the words of a contract must be the one that carries the intent of the parties as determined by the circumstances under which the contract was made." 837 F.2d at 263.

Examination of the parties' intent raises the troublesome question whether a general release in FELA cases is merely an engine by which an employer can evade FELA liability, or represents a rational and considered way to resolve claims and liabilities. On the one hand, FELA's underlying goal of allowing liberal recovery might counsel a finding that a general release of claims permits the employer to avoid FELA liability altogether and therefore violates S 5. But the Supreme Court appears to have rejected this view in Callen, permitting releases which "compromis[e] a claimed liability and to that extent recogniz[e] its possibility." 332 U.S. at 631. The question remains whether

_____

8. The plaintiffs, attempting to distinguish the Lanham decision from the Wilson decision relied on by the district court, argue that "the railroad in
Lanham was unsuccessful [at avoiding liability] because of the protection provided by 45 U.S.C. Section 55." Plaintiffs' Brief at 16. As Conrail points out, however, the Lanham court's analysis turned on the specific language of the release and the intent of the parties, and not on some general prohibition grounded in the language ofS 55. Consequently, the Lanham court's reference to 45 U.S.C. S 55 is dictum.

18

there is a way to protect employees' statutory rights while also upholding the parties' right to settle claims by contract.

A bright line rule like the one set forth in Babbitt, limiting the release to those injuries known to the employee at the time the release is executed, has the benefit of predictability. Under Babbitt, "a release must reflect a bargained-for-settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him." 104 F.3d at 93. The Sixth Circuit noted that the releases in Shubert and Duncan were void because they "granted general immunity to the railroad as opposed to addressing a specific instance of disputed liability." Id.

Yet, it is entirely conceivable that both employee and employer could fully comprehend future risks and potential liabilities and, for different reasons, want an immediate and permanent settlement. The employer may desire to quantify and limit its future liabilities and the employee may desire an immediate settlement rather than waiting to see if injuries develop in the future. To put it another way, the parties may want to settle controversies about potential liability and damages related to known risks even if there is no present manifestation of injury.

The question still remains whether a rule allowing parties to release claims related to known risks rather than known injuries reflects FELA's remedial goals. We believe it does. We hold that a release does not violate S 5 provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed. Claims relating to unknown risks do not constitute "controversies," and may not be waived underS 5 of FELA. See Callen, 332 U.S. at 631. For this reason, a release that spells out the quantity, location and duration of potential risks to which the employee has been exposed -- for example toxic exposure -- allowing the employee to make a reasoned decision whether to release the employer from liability for future injuries of specifically known risks does not violate S 5 of FELA.

19

To the extent that a release chronicles the scope and duration of the known risks, it would supply strong evidence in support of the release defense. But we are wary of making the validity of the release turn on the writing alone because of the ease in writing detailed boiler plate agreements; draft releases might well include an extensive catalog of every chemical and hazard known to railroad employment. For this reason, we think the written release should not be conclusive. We recognize that what is involved is a fact-intensive process, but trial courts are competent to make these kinds of determinations. While the elusiveness of any such determination might counsel in favor of a bright-line rule such as the Sixth Circuit adopted in Babbitt, we decline to adopt one here.

Instead, we conclude that a release may be strong, but not conclusive, evidence of the parties' intent. Where a specific known risk or malady is not mentioned in the release, it would seem difficult for the employer to show it was known to the employee and that he or she intended to release liability for it. Furthermore, where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boiler plate, not reflecting his or her intent. We recognize that this is a different (and more difficult) standard for railroad employers than is typical in non-FELA situations, but given the Supreme Court's pro-employee construction of the FELA, see Kernaw v. American Dredging Co., 355 U.S. 426, 432 (1958) ("it is clear that the general congressional intent was to provide liberal recovery for injured workers"); Boyd, 338 U.S. at 265 ("Congress wanted Section 5 to have the full effect that its comprehensive phraseology implies.") (internal quotation omitted), we adopt it.

IV.

Applying this standard, we hold that the releases in question are invalid under S 5 of FELA. While there is little doubt the parties were involved in settling claims, the question of the parties' intent is more problematic.

As a general matter, the language of the releases appears to recite a standard waiver of liability. Even though there is

20

no factual dispute that the agreements were reached during settlement negotiations, and that plaintiffs were all represented by counsel, the releases do not demonstrate the parties understood, let alone addressed or discussed, the scope of the claims being waived. For example, the McKee and Weaver releases are short, pro forma waivers, and do not indicate the parties negotiated any part of the releases other than the amount of settlement. At the other extreme, the releases signed by Wicker and Kleiner are more detailed, blanket releases which attempt to cover all potential liabilities. But these releases merely recite a series of generic hazards to which Wicker and Kleiner might have been exposed, rather than specific risks the employees faced during the course of their employment. Consequently, the releases do not demonstrate the employees knew of the actual risks to which they were exposed and from which the employer was being released. Even the Kaltenbrunner release, which contains a special exclusion for claims relating to carpal tunnel syndrome, does not recite that plaintiff was aware of and understood the other risks to which he was exposed. Consequently, there is no evidence that any of the plaintiffs, despite being represented by counsel, was aware of the potential health risks to which he had been exposed. Therefore, they could not have properly waived these claims.

Conrail contends that even if the releases apply only to injuries plaintiffs were aware of at the time they signed the releases, their claims here are still barred because they had knowledge of at least some of their symptoms. Although plaintiffs testified they were aware of certain symptoms when they signed the releases, the record does not demonstrate that they knew that these symptoms were related to their exposure to toxic chemicals at Conrail's plant. To the contrary, plaintiffs testified they did not connect the symptoms with their chemical exposure until after they had signed the releases, and that they were not aware of the risks associated with the various chemicals used at Conrail's facility. Therefore, the releases could not have settled claims with respect to those risks, and cannot bar plaintiffs' claims.

As noted, we hold that S 5 of FELA allows an employer to negotiate a release of claims with an employee provided the

21

release is limited to those risks which are known by the parties at the time the release is negotiated. In the case before us, we find the releases signed by the parties violate S 5 because they purport to settle all claims regardless whether the parties knew of the potential risks. Because the releases cannot bar plaintiffs' FELA claims, we will reverse the judgment of the district court and remand for proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit